**In re MONTGOMERY COURT APARTMENTS OF INGHAM COUNTY, LTD., Debtor.**

**Bankruptcy No. 2–90–07782. No. 38–2567292.**

United States Bankruptcy Court, S.D. Ohio, E.D.

May 22, 1992.

Judgment Entry May 26, 1992.

Mark A. Beatrice, Manchester, Bennett, Powers & Ullman, Youngstown, Ohio, for debtor.

Grady L. Pettigrew, Jr., Arter & Hadden, Columbus, Ohio, for Greyhound Leasing and Financial Corp.

Leonard A. Carlson, Schottenstein, Zox & Dunn, Charles M. Caldwell, Office of the U.S. Trustee, Carol Stebbins, and Fordham Huffman, Marilyn Shea–Stonum, Jones, Day, Reavis & Pogue, Columbus, Ohio, Michael L. Cook, Sally M. Henry, Skadden, Arps, Slate, Meagher & Flom, New York City, co-counsel to Trustee.

Jay Alix, Jay Alix & Associates, Southfield, Mich., Chapter 11 Trustee.

Leon Friedberg, Benesch, Friedlander, Coplan & Aronoff, Columbus, Ohio, for Official Committee of Unsecured Creditors.

Harvey S. Minton, Minton & Leslie, Columbus, Ohio, Charles J. Taunt, Charles J. Taunt & Associates, Birmingham, Mich., Gary H. Cunningham, Kramer Mellen, P.C., Southfield, Mich., Sp. Counsel to Trustee of the Consol. Estate.

James Bownas, General Counsel, Cardinal Industries, Inc., Columbus, Ohio.

### OPINION AND ORDER ON CONFIRMATION OF CHAPTER 11 PLAN

BARBARA J. SELLERS, Bankruptcy Judge.

Before the Court is the requested confirmation of a First Amended Plan of Reorganization ("Plan") proposed by Chapter 11

debtor Montgomery Court Apartments of Ingham County, Ltd. ("Montgomery Court"). Greyhound Financial Corporation ("Greyhound") objected to confirmation and voted to reject the Plan. No other parties objected to confirmation. Montgomery Court requested confirmation over Greyhound's rejection under the "cram down" provisions of Chapter 11 and the Court heard the matter. The Court also has considered the parties' prehearing and posthearing briefs as well as written comments from the Official Committee of Unsecured Creditors in the Cardinal Industries, Inc. consolidated cases.

The Court has jurisdiction in this contested matter under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L) which this bankruptcy judge may hear and determine. To facilitate the location of specific aspects of this opinion, an index is included as exhibit A.

## I. FACTS

### A. The Relationship Between Montgomery Court and the Cardinal Enterprise.

Montgomery Court is a syndicated Ohio limited partnership. The managing general partner is Cardinal Industries, Inc. ("CII"). CII and 31 of its corporate subsidiaries or affiliates ("Cardinal Enterprise") are also debtors in Chapter 11 cases before this Court. Those corporate estates have been substantively consolidated. Additionally, approximately 300 limited partnerships in which either CII or one of its subsidiaries is a managing general partner, and three related corporate entities (collectively "Partnership Debtors") also are Chapter 11 debtors in this Court.

The Cardinal Enterprise was a vertically integrated business structure which manufactured modules used in the construction of motels, retirement villages and apartment complexes, such as the one owned by Montgomery Court. The Cardinal· Enterprise controlled every aspect of development from "conception to consumption." Initial financing, management, accounting services and replacement parts all were provided by various arms of the Cardinal Enterprise. Approximately 1,000 properties were developed in this manner; approximately 550 of those were later syndicated to outside investors. *See, generally, Cardinal Industries, Inc. v. Buckeye Federal Savings and Loan Association (In re Cardinal Industries)*, 105 B.R. 834, 837 (Bankr.S.D.Ohio 1989).

The relationship between Montgomery Court and the Cardinal Enterprise is important because Montgomery Court is not an isolated Chapter 11 debtor before this Court. The Court previously has noted that events in the Cardinal Enterprise case necessarily impact the Partnership Debtors. *See In re Montgomery Court Apartments of Ingham County, Ltd.*, 126 B.R. 537, 359 (Bankr.S.D.Ohio 1991) and *In re Northgate Terrace Apartments, Ltd.*, 126 B.R. 762, 766 (Bankr.S.D.Ohio 1991). The reverse is also true. Further, it is the future value of receivables from retained partnerships which are the primary assets of the Cardinal Enterprise estate. Therefore, it is impractical to view Montgomery Court or any Partnership Debtor without considering the interrelated nature of the Cardinal Enterprise and the Partnership Debtors.

### B. The Relationship Between Montgomery Court and Greyhound.

Montgomery Court owns real property in Ingham County, Michigan on which a 59-unit single story apartment complex has been constructed (the "Property"). In January 1986, Montgomery Court executed a promissory note payable to Cardinal Industries Mortgage Company ("CIMC") in the principal amount of $1,160,000. That note carries an interest rate measured at 1.5% over the Citibank, N.A., prime rate. Recourse under the note is limited to the Property. Repayment of Montgomery Court's obligations under the note is secured by a mortgage against the Property, an assignment of rents and a security interest in all personalty. In 1986, CIMC assigned to Greyhound the note, mortgage, assignment of rents and security agreement.

Montgomery Court filed its voluntary petition for relief under Chapter 11 on November 19, 1990. In an order of February 15, 1991, the parties agreed to the use of the rents as cash collateral to pay the reasonable, necessary and ordinary expenses associated with the operation of the Property. After payment of enumerated expenses, net rents were to be paid to Greyhound up to the amount of the regular monthly payment required by the promissory note. One-half of any net income from the Property remaining after that payment was also to be paid to Greyhound to "be applied against Greyhound Financial's claim." Montgomery Court was to deposit the remaining one-half of its net income into a debtor in possession account. Those deposited funds were not to be used without the written consent of Greyhound.

### C. Plan Provisions.

Montgomery Court's Plan classifies claims and interests into fifteen classes. Greyhound's allowed claim is bifurcated into an allowed secured claim and an allowed unsecured claim based upon the provisions of 11 U.S.C. § 506(a) and the debtor's assertion that Greyhound's total claim exceeds the value of the Property. Greyhound disputes this characterization.

The Plan proposes to pay Greyhound's allowed secured claim on a thirty year amortization schedule with a discount factor of 9.825% per annum and a new maturity date measured by the earlier of December 31, 2000, or the sale of the Property or refinancing of the mortgage debt. Only interest will be paid on that secured claim during the first year of the Plan.

Montgomery Court calculates the amount of Greyhound's secured claim by first subtracting from the value of the Property estimated liquidation or transfer expenses. The secured claim is then increased by the amount of net rent payments made to Greyhound after the bankruptcy filing date, but prior to the effective date of the Plan. Additionally, those post-petition payments made under the cash collateral order are to be applied to satisfy the Debtor's obligation to Greyhound on account of its allowed secured claim during the first 10 or 11 months. of the Plan. (Amended Plan of Reorganization § 4.02). Greyhound strongly disputes the appropriateness of these provisions.

The Plan further provides that Greyhound's allowed unsecured claim may receive annual payments of interest at 4% per annum until the earlier of December 31, 2000, or the sale of the Property or refinancing of the mortgage obligation. Upon any of those events, a final payment of unpaid principal and accrued and deferred interest will be made. Payments on account of Greyhound's allowed unsecured claim will coincide with payments to be made on the allowed unsecured claims of certain Cardinal Enterprise affiliates. The allowed unsecured claims of those Cardinal Enterprise affiliates are also to receive interest at 4% per annum. Payments to either class of claims prior to any sale or refinancing are to be made only to the extent of available cash flow after operating expenses and the satisfaction of other payments under the Plan.

The Plan separately classifies the allowed interests of CII as general partner, R/E Management Services Inc. ("R/E") as an additional general partner, and the thirty-five individual limited partners ("Limited Partner(s)"). CII is to contribute new capital based upon its proportionate equity interest in the partnership, consistent with the total capital contributions required from all interest holders. The Plan, however, proposes to offset CII's contribution against its administrative expense claim.

Section 5.05 of Montgomery Court's Plan provides that the Partnership Agreement "shall be further amended as of the Effective Date, to remove R/E as an additional general partner of the Debtor." CII is to continue as the managing general partner.

The Plan's treatment of interests held by the Limited Partners is more complicated. Because confirmation has been requested under the "cram down" provisions of § 1129(b), the only equity interests which survive confirmation are those designated as new class A units, to be purchased during the confirmation process for a $2000

contribution of new capital for each such unit.

The Plan also separately classifies and provides for any allowed claims of Pittsburgh National Bank ("PNB"), the holder of certain investor notes executed by the Limited Partners. The treatment of this class is confusing. The Plan provides that Montgomery Court will object to the allowance of any claim in this class, but estimates this claim at $9,755 plus interest. (Amended Plan of Reorganization § 4.04). PNB did not file a proof of claim and does not appear on Montgomery Court's schedule of liabilities.

The remaining classes under the Plan are to receive payment of the full amount of each allowed claim within approximately three months of the entry of a final confirmation order.

## D. Plan Voting.

Greyhound voted to reject Montgomery Court's Plan, but cast only one ballot. The Court presumes, based upon the arguments of Greyhound, that Greyhound rejects the treatment proposed for both its secured and unsecured claims, if it is determined to have an unsecured claim. R/E did not cast any votes and under § 1126(g) is deemed to have rejected the Plan. PNB did not vote. The remaining classes entitled to vote overwhelmingly accepted the Plan. The class of Limited Partners accepted the Plan by a vote of 14 to 2 and Montgomery Court received $24,000 in new capital contributions from accepting Limited Partners.

## II. ISSUES PRESENTED AND SCOPE OF THE DECISION

The primary question presented to the Court is whether the Plan proposed by Montgomery Court satisfies each confirmation requirement of 11 U.S.C. § 1129. Because of the impact of issues raised in this case on other Partnership Debtors associated with the Cardinal Enterprise, the Court will address each issue which was fully briefed and argued by the parties.

■ Greyhound urges that confirmation of Montgomery Court's Plan must be deter-mined on its own facts. The Court agrees with that contention. Confirmation of any Chapter 11 plan of reorganization is a fact-specific process. Each plan and plan proponent must satisfy all applicable elements of 11 U.S.C. § 1129 before the Court can confirm a proposed plan. Therefore, confirmation of Montgomery Court's Plan rests solely on the facts in this case.

There are, however, legal issues underlying Montgomery Court's Plan and Greyhound's objections that permeate all the Cardinal Partnership cases. Montgomery Court is the first Cardinal Partnership debtor to proceed to confirmation of its plan without the support of its primary secured lender. Much time has been spent by Montgomery Court, Greyhound and the Court preparing for the confirmation hearing. Each party raised specific legal issues relating to the proposed Plan and each fully briefed those legal issues.

The process by which the Partnership Debtors propose plans of reorganizations is necessarily interrelated. Even though each Partnership Debtor has distinct facts and economics which drive its plan of reorganization, many legal issues overlap. For those reasons and for reasons of judicial economy, the Court believes it is appropriate and necessary to address all issues presented by Montgomery Court and Greyhound.

## III. DISCUSSION AND CONCLUSIONS OF LAW UNDER 11 U.S.C. § 1129(a)

■ A Chapter 11 plan proponent must show that all elements of 11 U.S.C. § 1129(a) have been met. *In re Future Energy Corporation*, 83 B.R. 470, 481 (Bankr.S.D.Ohio 1988). Additionally, even if no objection to confirmation has been filed, the statutory language imposes an independent duty on the Court to find that the confirmation tests have been met.

A. Uncontested, Satisfied or Inapplicable Confirmation Elements [§ 1129(a)(4), (5), (6), (9), (10), (12), (13)].

There are several subsections of § 1129(a) not implicated by Greyhound's objections. Some, such as § 1129(a)(6) and

(13) do not apply to Montgomery Court. Other Plan provisions relating to the approval of costs and expenses in connection with the case, the treatment of priority claims and the identity of retained insiders satisfy the requirements of § 1129(a)(4), (5) and (9). In addition, at least one impaired non-insider class has accepted the Plan, and Court and United States Trustee costs have been paid. Therefore, §§ 1129(a)(10) and (a)(12) are satisfied.

B. Contested Confirmation Elements [§ 1129(a)(3), (7) and (11)].

1. *Good Faith [§ 1129(a)(3)].*

Greyhound contends that the Plan was not proposed in good faith because Greyhound "has been denied its contractual rights." (Greyhound's Post–Confirmation Hearing Brief, pp. 23–24) The contractual rights with which Greyhound seems most concerned are those it perceives to be affected by the default provisions in the Plan.[1] Greyhound also asserts, in general, that the Plan impermissibly treats Greyhound's claim.

The Court fails to see how Greyhound's unhappiness with the Plan's terms can give rise to a finding of bad faith on the part of the Debtor under 11 U.S.C. § 1129(a)(3). Chapter 11 plans routinely alter the contractual rights of parties. *See* 11 U.S.C. § 1123. Whether a plan has been proposed in good faith, however, is determined "in light of the totality of circumstances" and in light of the Bankruptcy Code's purpose to provide debtors with a fresh start. *B.M. Brite v. Sun Country Development, Inc. (In re Sun Country Development, Inc.),* 764 F.2d 406, 408 (5th Cir.1985). *See, also, Future Energy,* 83 B.R. at 486.

Greyhound presented no evidence to support its claim of lack of good faith or

from which the Court could infer that the Plan is not intended by the Debtor as an effort to reorganize. Greyhound's arguments regarding specific Plan terms are better addressed under particular requirements for confirmation and, specifically, under the "fair and equitable" requirements of 11 U.S.C. § 1129(b). Therefore, the Court overrules Greyhound's objection that the Plan is not proposed in good faith and finds that the Plan satisfies § 1129(a)(3).

2. *Comparison with Liquidation Under Chapter 7 [§ 1129(a)(7)].*

Each nonaccepting, impaired claimant or interest holder is protected under § 1129(a)(7) from receiving less under a plan of reorganization than it would receive if the debtor's property were liquidated under Chapter 7 of the Bankruptcy Code. *See In re Thurmon,* 87 B.R. 190, 191 (Bankr.M.D.Fla.1988). That analysis is often referred to as the "best interests of creditors test." The only ballots cast which rejected the Plan were cast by Greyhound and by two Limited Partners. R/E is also deemed to have rejected the Plan. There are other scheduled claimants and interest holders which did not vote.

The best interests test requires the Court to consider the value of Montgomery Court's assets in excess of valid liens and exemptions, and, using the payment priorities set out in Chapter 7 of the Bankruptcy Code, find that each nonaccepting claimant or interest holder will receive at least as much under the Plan as it would receive if Montgomery Court's assets were liquidated under Chapter 7 at the date of confirmation. Because Montgomery Court is a partnership, the assets of CII and R/E, its general partners, would also be reachable

---

**1.** Montgomery Court's Plan provides that Greyhound "shall not accelerate the new maturity date of the Note nor foreclose on the Mortgage Deed for any reason except upon … an uncured Event of Default." (Amended Plan of Reorganization, § 4.02) Section 1.30 of the Plan defines "Event of Default" as follows:

1.30. An "Event of Default" shall mean the failure by the Debtor to make a payment in respect of the Class 2 Claim (Lender Secured)

in the amount and at the time set forth in this Plan, if such failure is not cured within sixty (60) days after receipt of written notice from the Current Mortgage Lender and shall further mean the failure of the Debtor to meet any of its obligations under the Mortgage Deed, other than the obligation to make payments, if such failure is not cured within thirty (30) days after receipt of written notice from the Current Mortgage Lender.

by a trustee in Chapter 7. *See* 11 U.S.C. § 723.

Greyhound, however, does not assert that Montgomery Court has failed to propose a plan which offers nonaccepting claimants less than each would receive in a liquidation under Chapter 7 of the Bankruptcy Code. Rather, Greyhound focuses on a perceived unfairness of the treatment proposed for its claim. These arguments, however, again are better addressed under the "fair and equitable" requirement of 11 U.S.C. § 1129(b).

Greyhound further contends that Montgomery Court's liquidation analysis fails to include the effect of potential voidable transfers. Montgomery Court and CII, however, have filed a motion to reconcile any claims flowing between Montgomery Court and the Cardinal Enterprise. That motion alleges that the net effect of such reconciliation is a liability from Montgomery Court to CII and its affiliates. Although Greyhound has objected to the reconciliation motion, it did not present any evidence to contradict Montgomery Court's assertion that the analysis of such transfers and claims yields a net liability to Montgomery Court. For purposes of the best interests test only, the Court finds that there has been no showing of assets owned by Montgomery Court other than the Property and its associated personalty.

In a subsequent portion of this opinion, the Court determines that Greyhound's total allowed claim exceeds the value of the Property. Were that valuation to take place in the context of a Chapter 7 liquidation, the value would be much lower. Consequently, were Montgomery Court's assets to be liquidated under Chapter 7, general unsecured creditors and interest holders would not receive any payments on account of their claims or interests from assets owned by Montgomery Court.

The Plan proposes payment to each holder of an allowed unsecured claim. Generally, the payment to noninsiders excluding Greyhound, is 100 percent of the face value of each allowed unsecured claim within approximately three months of a final order of confirmation. Greyhound's unsecured claim is to be paid 100 percent of its face value at the end of the Plan's term. Clearly, this proposed treatment is better than if the Property were liquidated under Chapter 7 of the Bankruptcy Code and all proceeds paid to Greyhound on account of its secured claim. Further, under a Chapter 7 liquidation Greyhound would not have an allowed unsecured claim because its recourse is limited to the Property by the promissory note. Only under Chapter 11 is Greyhound entitled to an allowed unsecured claim. *See* 11 U.S.C. § 1111(b)(1)(A). Therefore, any analysis of the financial status of Montgomery Court's general partners is legally irrelevant as to Greyhound.

■ The Court finds that Montgomery Court's Plan satisfies the test of § 1129(a)(7) insofar as holders of claims are concerned. The Plan provides payment to all holders of allowed unsecured claims which is greatly in excess of what such claimants would receive if Montgomery Court's assets were liquidated under Chapter 7 at the time of confirmation.

### 3. *Feasibility [§ 1129(a)(11)].*
#### a. Generally.

Greyhound argues that the Plan is not feasible because Montgomery Court's management is inadequate, its financial statements and projections are unreliable, and projected economic performance is unsupported by its postpetition performance.

■ To establish feasibility under § 1129(a)(11), a proponent must show its the plan offers "a reasonable prospect of success" and is workable. *In re E.I. Parks No. 1,* 122 B.R. 549, 558 (Bankr.W.D.Ark. 1990). The test of whether the proponent can accomplish what the plan proposes is a practical one. *Clarkson v. Cooke Sales & Service Co. (In re Clarkson),* 767 F.2d 417, 420 (8th Cir.1985). Although more is required than mere hopes and desires, success need not be certain or guaranteed. *See E.I. Parks,* 122 B.R. at 558 and *Prudential Insur. Co. v. Monnier Brothers (In re Monnier Brothers),* 755 F.2d 1336, 1341 (8th Cir.1985). In this Court's experience, the burden on the proponent increas-

es as the composition of debt deepens and the resulting discharge broadens.

Feasibility of a plan such as that proposed by Montgomery Court requires the proponent to establish two components. First, the projections of future earnings and expenses must be derived from realistic and reasonable assumptions which are not merely speculative. *See, generally, Monnier Brothers,* 755 F.2d at 1341. Second, the ability to make the payments proposed must be demonstrated, based upon the projections. Both showings must be made, but need not come from the same source. Montgomery Court attempted to show these components in reverse order and some confusion resulted from that approach.

### b. Arithmetic Feasibility

Robert E. Pausch, a department head at CII, testified that he was partially responsible for the development of Montgomery Court's Plan and that he had a current understanding of it. (Tr. I–52). His testimony, however, related to the second component of feasibility. Mr. Pausch testified that if Montgomery Court met its budget, it could make the payments proposed under the Plan. (Tr. I–74). Greyhound strenuously objected to this testimony on numerous grounds, but failed to establish that the projections were arithmetically incorrect. The Court overruled Greyhound's objection.[2]

In its posthearing brief, Greyhound asserts that Mr. Pausch testified regarding the reasonableness or feasibility of the income and expenses projected by Montgomery Court. However, this is an inaccurate characterization of Mr. Pausch's testimony. Mr. Pausch was asked to assume the viability of Montgomery Court's economic projections and indicate whether Montgomery Court could meet its proposed Plan payments if those projections were met.

Greyhound's misunderstanding of the purpose of Mr. Pausch's testimony resulted in lengthy and, frankly, confusing evidentiary objections during the hearing and in the posthearing brief. (Tr. I–68–74). The Court believes that Greyhound was concerned primarily with the underlying basis for Mr. Pausch's opinion on feasibility. Mr. Pausch's testimony and opinion on feasibility of the Plan, however, were very limited and did not involve an opinion about the reliability of Montgomery Court's projected income and expenses. Mr. Pausch's opinion that Montgomery Court could make its payments under the Plan if its projections of net income were met is fully supported by Montgomery Court's exhibits 1, 2 and 3 which were admitted without objection.[3]

In its ruling on Greyhound's objection, the Court recognized the distinction between the different components of feasibility.

.... The question was not can the Debtor meet its budget, which I agree with you is not a question that there's been enough foundation for this witness to answer; the question was: Given that the Debtor—or if the Debtor meets the budget, can the plan payments be made? So I think it's a function of asking Mr. Pausch whether this document, which shows the plan projections, works out arithmetically, so to speak, if the budget is realized. That's a very different question. I don't think that's a question that he has to have much personal information about to answer.

(Tr. I–71–72).

### c. Realistic Projections.

Much of Montgomery Court's feasibility evidence related to the first component of feasibility, the realism and reasonableness of the projected income and expenses.

---

**2.** Greyhound objected to Mr. Pausch's testimony at several different times. Mr. Pausch had not been offered as an expert at the time of the first objection. Subsequently, he was offered as an expert on matters relating to valuation and interest rates. Greyhound's objections, which relate to those portions of his testimony, will be addressed later in this opinion.

**3.** Exhibit 1 was referred to by several witnesses as the "Plan Economics." Exhibit 2 consists of the 1991 financial statements for Montgomery Court. Exhibit 3 is a budget developed for Montgomery Court for 1992 and beyond.

That testimony was elicited from David E. Williams, an executive vice president in charge of the operations of Cardinal Apartment Management Group ("CAMG"). CAMG is the management company chosen by Montgomery Court under the Plan to manage the Property. Mr. Williams' qualifications as an expert in the area of professional property management were not objected to by Greyhound, (Tr. I–216–217), and on that basis he opined about the accuracy of Montgomery Court's projections. Mr. Williams' experience, knowledge and familiarity with Montgomery Court and its operations was evident.

### (1) Income.

Presumably because Montgomery Court owns and operates an apartment complex, much time was spent by both parties discussing occupancy rates and vacancy levels generally.[4] Greyhound contends that Montgomery Court's projected occupancy level is unrealistically high, based upon historic data.

Montgomery Court projects an economic vacancy of 7.96% in 1992. This number appears to be 7 to 8% lower (or better) than the actual economic vacancy experienced in 1991. The Court is satisfied, however, that the projection of better performance in 1992 is reasonable. Mr. Williams testified that the location of Montgomery Court's property is in a growth area of Michigan. (Tr. I–218). Development of shopping areas and businesses, coupled with restrictions on further housing development because of wetland restrictions, gives Montgomery Court a strong position in the area. (Tr. I–219). Testimony of the appraiser presented by Greyhound also supports this conclusion. (Tr. II–241 and Greyhound's exhibit O p. 7).

An important reason for the anticipated lower economic vacancy projected in 1992 comes from a planned change in the mix of apartment units offered by Montgomery Court. Currently, that mix includes five one-bedroom furnished units which historically have had higher physical vacancy rates than the unfurnished units (Williams Tr. I–268–269). Mr. Williams testified that by removing the furniture from those units and renting them as unfurnished units, the Property will have a lower overall vacancy level. If marketed as unfurnished, those units should command a lower rent, but higher and more stable occupancy.

In addition, the evidence established that occupancy is not the only barometer of the profitability of an apartment complex. The objective, to obtain the greatest possible revenue, is not necessarily achieved by the highest occupancy. (Tr. I–265–266). Increased occupancy may not result in increased revenue if the additional tenants do not pay their rent, have been given rent concessions, or are assessed below-market rents. Thus, since occupancy drives the revenue component of the Plan's projections, Montgomery Court's projections for revenue are reasonable.

### (2) Expenses.

The Court also finds that Montgomery Court's projected expenses are within a reasonable range. Mr. Williams testified extensively regarding the projected expenses and compared those expense ratios to industry guidelines issued by The Institute of Real Estate Management. Generally, Montgomery Court's expenses and its assumption of a four percent increase in revenue and expenses per year are within those guidelines. (Tr. I–224).

---

**4.** Greyhound failed to distinguish between different measures of occupancy/vacancy levels. This failure resulted in some general confusion and a lengthy discussion of occupancy/vacancy levels.

Mr. Williams described the difference between "physical vacancy" and "economic vacancy" as follows:

Characteristically if you go to physical vacancy, you're counting numbers of apartments vacant at a point in time on a monthly basis. When you're talking about your eco-

nomic vacancy, you're realizing the revenue derived from the property itself in dollars. And what that means is that there is a likelihood that you have a physical unit that's vacant and you recognize that loss at the time. In addition to that, you have turnover that needs to be recognized in there. Tenant A moves out the 1st of March and Tenant B might move in the 5th of March, that loss of revenue is recognized in economic vacancy where it may not be in physical.
(Tr. I–232).

During the hearing Greyhound focused on Montgomery Court's 1990 expenses, which were somewhat higher than the 1989 and 1991 actual figures, and the 1992 projections. Although Mr. Williams could not explain every deviation, he offered general explanations which the Court finds reasonable.

Even though 1990 expenses appear high, those expenses were brought within industry guidelines in 1991 and continue within those guidelines in the 1992 projections. Greyhound is correct in its assertions that Montgomery Court's financial records still contain inconsistencies. These inconsistencies appear relatively minor and occasional, however, and do not support a finding of such unreliability that feasibility cannot be demonstrated. Mr. Williams's testimony clearly supports a finding that the accuracy of Montgomery Court's financial records has improved dramatically. The Court recognizes that reorganization is a process rather than an instantaneous transformation.

Montgomery Court has experienced identifiable problems with its real estate tax liabilities. Mr. Williams testified that the real estate taxes for 1992 are "exorbitantly high." (Tr. II–13). A higher assessment of the Property by the taxing authority caused the increase in the real estate taxes. That assessment is on appeal. Additionally, all postpetition real estate taxes have been paid and an escrow account is to be established for real property taxes based upon the current assessment. (Testimony of Barry Montrose Tr. II–111). Any confusion over the new level of assessment appears to be alleviated at this time.

Greyhound questioned Mr. Williams extensively about the differences between economic projections provided by Montgomery Court to Greyhound in July 1991 and those provided in January 1992. All the reasons for those differences were not explained. The passage of time explains some of them because the 1992 projections depend on actual financial data for the entire year of 1991 which was not available in July of 1991. The Court understands Greyhound's frustration with forecasts which change and historical data that appears to change. Unless the latest data is shown to be inaccurate or undiscoverable, the conclusions to be drawn from such fluctuations relate not to accuracy, but to reliability. Certainly reliability is an important component, however.

Montgomery Court established by testimony that its Plan has a reasonable likelihood of success. In addition to a net operating income reasonably projected to be sufficient to make the payments proposed for Greyhound's secured claim, Montgomery Court received $24,000 in capital contributions from its Limited Partners. If Montgomery Court's projections fall short, as Greyhound suggests, this $24,000 will be available to cover such shortfall. Further, Montgomery Court has budgeted a $35,000 operating reserve fund to assist in any unexpected shortfall in income from operations.

Montgomery Court also established that sufficient funds would be available to meet the initial funding required by the Plan. As of the hearing date, Montgomery Court had $35,000 in its debtor in possession general account and approximately $18,600 in a separate security deposit account. (Testimony of Barry P. Montrose II–110). Additionally, counsel for Montgomery Court had $24,000 in a separate escrow account which represented the new contributions from the Limited Partners. Collectively, these funds ensure that Montgomery Court can pay its administrative claims, fund an operating reserve, pay current operating expenses and make the initial payments required under the Plan. Even after February payables are deducted from the general account, sufficient funds should remain to pay the general allowed unsecured claims in the time frame proposed by the Plan. The security deposit account contains sufficient funds to pay the allowed unsecured claims of security deposit claimants.

d. Postpetition Performance.

Finally, Greyhound attacks the Plan's viability because of alleged violations by Montgomery Court of the cash collateral agreement. Greyhound contends that

since Montgomery Court could not abide by the cash collateral order, it is unlikely that Montgomery Court will abide by the Plan terms. Again these allegations are unsupported by the record.

A witness for Montgomery Court testified that $69,000 was "passed through" to Greyhound in 1991 under the cash collateral agreement. Further, a payment of $3,947 was made by Montgomery Court to Greyhound in January 1992. (Testimony of Barry P. Montrose Tr. II–113). Greyhound's witness testified that the payments in 1991 were "sporadic," but did not specifically dispute the total amount received. (Testimony of Jill Carabelli Tr. II–166).

The Court is unable to determine from the record what, if any, violations of the cash collateral order occurred. The Court cannot presume either the fact of such violations or that any violations would establish how Montgomery Court will perform under the Plan. It appears that the greatly increased tax assessment caused a lesser amount to flow to Greyhound than both parties expected. The evidence on this point was insufficient to permit the Court to make any definitive findings, however.

Greyhound also challenged the reasonableness of Montgomery Court's economic projections on the ground that CAMG does not provide adequate, capable management to achieve the projected goals and that CAMG's status as a Chapter 11 debtor makes its future uncertain. Greyhound's accusations of mismanagement by CAMG are largely unsupported by the record, and the plan of reorganization proposed in CAMG's case contemplates its continued function as a management company. Given Mr. Williams' credentials and qualifications as a property manager, the Court believes that the physical and economic vacancy rates projected for Montgomery Court are reasonable and not speculative and that CAMG's management skills are adequate.

e. Conclusion on Feasibility.

■ The Court finds that Mr. Williams provided ample support for the reasonableness of Montgomery Court's projections.

He established that the Plan has a reasonable likelihood of success. The test for feasibility, based upon reasonableness rather than guarantee of success, has been met. *See Monnier*, 755 F.2d at 1341. Other evidence established the arithmetic correctness of the projections and the availability of funds for immediate requirements of the Plan. On that basis, this Court is satisfied that, although its relatively small size especially forces Montgomery Court to meet certain challenges to increase its income and contain or decrease its expenses, the feasibility test of § 1129(a)(11) has been met.

C. The Remaining Confirmation Elements [11 U.S.C. § 1129(a)(1), (2) and (8)].

1. *Compliance With Title 11 (§ 1129(a)(1) and (2)).*

■ Greyhound's remaining objections best relate to 11 U.S.C. §§ 1129(a)(1) and (2) which require a Chapter 11 plan and its proponent to comply with the applicable provisions of Title 11. Greyhound contends that Montgomery Court solicited acceptances with one set of economic projections and sought confirmation with another. Greyhound concludes that this violates the disclosure requirements of 11 U.S.C. § 1125(b).

It is true that Montgomery Court's projections of income and expenses in the amended disclosure statement are different than the projections relied upon at the confirmation hearing. Mr. Williams satisfactorily explained the differences. Further, there is no indication that Greyhound would have voted differently given the more recent projections. The amended disclosure statement used by Montgomery Court to solicit acceptances was not materially different from the evidence at the confirmation hearing. The Court finds that Montgomery Court and its Plan complied with the applicable provisions of Title 11 relating to disclosure and solicitation.

■ The Court, however, notes some technical problems with Montgomery Court's Plan. The order approving Montgomery Court's amended disclosure state-

ment inadvertently failed to require counsel for Montgomery Court to file a certificate of service showing the parties on which the Plan and amended disclosure statement were served. Before the Court will confirm any Chapter 11 plan, such certificate of service must be filed.

Further, the Court finds Montgomery Court's proposed treatment of the Class 4A claimants confusing. Even though Montgomery Court intends to object to the claims of Pittsburgh National Bank (the holder of the investor notes), Montgomery Court estimates the total allowed claim at $9,755 plus interest. It is unclear to the Court whether this claimant even had notice of the confirmation hearing. The Court is unable to rule on this provision of Montgomery Court's Plan until this confusion is alleviated.

The Court must also reserve ruling on Montgomery Court's proposed treatment of R/E's general partner interest in Montgomery Court until it is clear whether R/E received the appropriate notice.

### 2. *Acceptance or Non–Impairment [§ 1129(a)(8)].*

Greyhound voted to reject Montgomery Court's Plan. The Plan places Greyhound in two separate classes and it controls both of those impaired classes. Such control means that Montgomery Court could not satisfy the requirement in § 1129(a)(8) that each impaired class of claims accept the Plan. The Court nevertheless may confirm a Chapter 11 plan over the objection of a dissenting class if the Plan meets the requirements of 11 U.S.C. § 1129(b). Montgomery Court has requested confirmation under those "cram down" provisions.

## IV. DISCUSSION AND CONCLUSIONS OF LAW UNDER 11 U.S.C. § 1129(b) ("CRAM DOWN")

### A. Generally.

Confirmation under the "cram down" provisions of Chapter 11 requires the plan proponent to establish that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). That section further provides a non-exhaustive list of requirements for "fair and equitable" which vary depending upon whether the "cram down" is sought against classes of secured claims, unsecured claims or interest holders. The only classes not accepting the Plan, other than PNB, and, therefore, the only classes for which the "cram down" tests must be considered, are the two classes in which Greyhound is the only member.

### B. The Fair and Equitable Standard.

#### 1. *The Statutory Mandate for a Dissenting Secured Class.*

With respect to Greyhound's secured claim, Montgomery Court has chosen to proceed under 11 U.S.C. § 1129(b)(2)(A)(i) which states:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides—
>
> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

Montgomery Court's Plan provides for Greyhound to retain its lien. Thus, subsection (i)(I) of § 1129(b)(2)(A) is met. Subsection (i)(II) is more complicated and the parties dispute whether its requirements have been met. In this case, Greyhound has not made an election under § 1111(b) of Title 11 and, therefore, those requirements mandate that the Plan provide for Greyhound

to receive at least the present value of its allowed secured claim.

### a. The Secured Claim.

The first dispute concerns the amount of Greyhound's allowed secured claim. That dispute extends to the value of the Property, the extent of that value to which Greyhound's interest attaches and the appropriateness of an addition to that claim for net rents paid to Greyhound under the agreed cash collateral order.

The parties stipulated that as of the bankruptcy filing date of November 19, 1990, Greyhound's total claim against Montgomery Court was $1,205,916.35. Greyhound contends that it is fully secured because the value of the Property against which it has a mortgage, assignment of rents, and security interest is $1,250,000.

Montgomery Court contends that the value of the Property is $1,131,072 and that Greyhound's interest does not extend to that full value because a deduction must be taken for expenses associated with any sale or transfer of the Property which must occur if Greyhound is forced to look to its collateral for satisfaction of its obligation. Montgomery Court further asserts that the net rents paid to Greyhound postpetition are to be added to the amount of Greyhound's secured claim. After those adjustments, Montgomery Court asserts that Greyhound's allowed secured claim should be $1,093,953.

### (1) *The Value of the Property.*

Valuations of real property, like projections of income and expenses, are inherently imprecise. Opinions realistically may differ, depending upon the method of valuation used and the nature of assumptions adopted.

Greyhound and Montgomery Court each offered expert testimony on the value of the Property. Greyhound's expert utilized three approaches, but found income capitalization and sales comparisons most appropriate for estimating the value of the Property. (Ex. O p. 46).

Montgomery Court offered the testimony of Mr. Pausch as an expert in the areas of value, capitalization and interest rates.

Greyhound objected to Mr. Pausch's qualification as an expert witness because Mr. Pausch is an employee of CII and because the facts relating to feasibility upon which he relied for his opinion had not been admitted into evidence at the time he testified.

Rules 702 and 703 of the Federal Rules of Evidence govern the qualification and opinion testimony of experts. A witness may be qualified as an expert notwithstanding his employment by a party. *Dunn v. Sears, Roebuck & Co.*, 639 F.2d 1171, 1174, *corrected*, 645 F.2d 511 (5th Cir.1981). Qualification depends upon a witness' "knowledge, skill, experience, training or education," not employment. Fed.R.Evid. 703 and *Dunn*, 639 F.2d at 1174. The employment of a witness offered as an expert might be relevant to show bias on cross-examination, but is not a barrier to qualification. *Dunn*, 639 F.2d at 1174.

Mr. Pausch testified extensively about his education, training and experience. (Tr. I–81–85). He worked for several financial institutions before joining the Cardinal Enterprise in 1982. Specifically, from 1974 he was involved in obtaining and marketing commercial loans, determining appropriate interest rates, and estimating real property values. (Tr. I–85). Based upon Mr. Pausch's experience and knowledge, the Court qualified him as an expert in the areas of valuation and interest rates. Greyhound did not present facts or legal arguments which would support a different result.

Greyhound's second argument appears to relate to the facts relied upon by Mr. Pausch to develop his opinion on value. Even though those facts had not been previously admitted, Mr. Pausch testified from and relied upon Montgomery Court's exhibits 1, 2 and 3. Those exhibits were all subsequently admitted. Most of Greyhound's objections to the admission of Mr. Pausch's testimony on value, therefore, are more appropriately matters which should have been raised on cross-examination to test the witness' knowledge and credibility.

■ Both experts relied primarily on the income capitalization approach to valuation. This is the most appropriate method for valuing income-producing property. *See In re Club Associates,* 107 B.R. 385, 391 (Bankr.N.D.Ga.1989). Stated simply, this approach first determines a net operating income ("NOI") for the property and capitalizes that NOI at a rate of return believed to be sufficient to attract investors in the property.

Selection of the appropriate capitalization rate is critical to the valuation process. Mr. Pausch testified that a rate of 10.5% was appropriate for Cardinal apartment properties. (Tr. I–99). Greyhound's appraiser utilized three capitalization rates (10, 10.5 and 11%) and testified that all were acceptable. (Testimony of Constance Doherty Tr. II–266). Mr. Pausch specifically testified, however, that 10.5% is needed to attract investors to the Cardinal apartment product line and that sales of Cardinal apartment properties over the last two years have reflected that rate. Based upon that testimony, which came not only from expert opinion, but also from the witness' personal knowledge, the Court finds that a capitalization rate of 10.5% is fully supported by the record.

The Court notes that Greyhound's appraiser used an 11% capitalization rate in her written report (Ex. O. p. 41). Ironically, a higher capitalization rate will produce a lower value, but because her estimated NOI was much higher than Montgomery Court's estimated NOI, the final value obtained was higher.

The other vital component of the valuation is the NOI calculation. Even though both experts applied similar methodologies, the estimation of value by Greyhound's expert was somewhat higher. That difference is attributable to her use of rental rates and estimates of income and expenses from other apartment complexes. (Greyhound's Ex. O pp. 27–41). It is more appropriate to use projections for the property to be valued, if such projections are reasonable. Montgomery Court's projections appear to the Court to be reasonable and, therefore, more appropriate for use than facts relating to other properties.

In general, the testimony of Mr. Pausch was better grounded and more credible than that of Greyhound's appraiser. Although the valuation process is not a precise one, decisions made in the process must be supported by realistic data. Greyhound's witness admitted that she had no expertise in property management, but was quick to criticize Montgomery Court's management company. Such criticisms, which lacked evidentiary support or personal knowledge, caused her to base estimates of income and expenses on her perceptions of other apartment complexes or on how she felt Montgomery Court should perform, rather than on actual performance.

Montgomery Court's witnesses testified extensively about projected income, expenses and capitalization rates. That evidence was more thorough and complete than was that of Greyhound's expert. Accordingly, based upon Montgomery Court's projected 1992 NOI and a 10.5% capitalization rate, the Court finds that the best estimate of the value of the Property at the hearing date is $1,131,072.

(2) *The Extent of Greyhound's Interest.*

The Court next must determine the extent of Greyhound's interest in the Property. *See* 11 U.S.C. §§ 506(a) and 1129(b)(2)(A)(i)(II). That issue involves the propriety of the Plan's proposed ten percent deduction from the value of $1,131,072 for hypothetical liquidation or transfer expenses and the impact of the postpetition net rents.

(A) Deduction From Property Value for Hypothetical Liquidation Or Transfer Costs.

This Court has recently determined that in a reorganization proceeding a deduction from collateral value for hypothetical liquidation or transfer expenses is appropriate because the measure of the allowed secured claim is not the value of the property, but the value of the creditor's interest in the estate's interest in the property. *See* 11 U.S.C. § 506(a). That value reflects what the creditor would receive were it

forced to resort to its collateral for collection of its debt. *See In re Weber*, case no. 2-91-04058 (unreported opinion) (Attached as exhibit B). The reasoning and statutory analysis in *Weber* is adopted in this opinion.

The *Weber* decision also supports the use of a standard 10% deduction to be applied in consumer cases. Where commercial property is involved, however, the party proposing the deduction must show affirmatively the factual reasonableness of the estimated deduction.

Montgomery Court presented its testimony on this issue through the managing partner of the Columbus branch of Kenneth Leventhal and Company. (Testimony of John Blust Tr. II–122.) Mr. Blust testified that general accounting standards recognize that the "net realizable value" of real estate includes a deduction for various costs associated with completion, holding and disposal of real estate. (Tr. II–123). These include legal, environmental, engineering, survey and appraisal costs. (Tr. II–126–127). Mr. Blust estimated that the total range for such costs would be 8.1% to 11.6% of the value of the property. (Tr. II–130).

Greyhound contends that it would not incur such costs because it would intend merely to hold the Property. This contention, however, was not supported by the evidence. Greyhound's witness testified about expenses Greyhound incurs in foreclosing and holding real estate. (Testimony of Jill Carabelli Tr. II–222–226). While this testimony was not specific or unconditionally supportive of the particular percentage selected by Montgomery Court, it certainly does not discredit it.

■ Accordingly, Montgomery Court has established by uncontroverted evidence that it is appropriate and reasonable to subtract ten percent from the value of the Property for estimated expenses of sale or transfer prior to fixing the extent of Greyhound's interest in the Property. Although ten percent may not always be a reasonable estimate, the facts established here make that estimate appropriate.

**(B) Addition for Postpetition Payment.**

■ The last adjustment Montgomery Court seeks to apply to the fair market value of the Property to determine the extent of Greyhound's interest in the Property relates to the postpetition rents paid to Greyhound under the cash collateral order. Montgomery Court wishes to increase the amount of Greyhound's allowed secured claim to be paid over time by an amount equal to the rents paid to Greyhound since the Chapter 11 filing. Montgomery Court would then credit that amount against payments proposed under the Plan for Greyhound's allowed secured claim during the first year of the Plan.

Although Greyhound appeared to object to such addition, that treatment is favorable to it. Therefore, the Court believes that the objection is more properly to the application of the amount added to satisfy the initial payments required under the Plan rather than to the addition to the allowed secured claim. Such addition is permissible, although it may not be the only appropriate treatment of such postpetition payments.

In conclusion, the Court finds permissible Montgomery Court's proposals to subtract ten percent from the appraised value of the Property for estimated transfer costs and to add to the appraised value for rents paid to Greyhound postpetition. This process will yield the amount of the allowed secured claim to be paid over time with an appropriate discount factor.

b. Deferred Cash Payments.

■ Section 1129(b)(2)(A)(II) next requires that the holder of the secured claim receive on account of that claim deferred cash payments. Greyhound objects to Montgomery Court's proposal to satisfy such payment requirements in the initial months of its Plan by application or "credit" for the previously "passed-through" rent payments.

Greyhound contends that "the amended Plan not only improperly credits postpetition payments against GFC's principal and interest, but also then credits the same payments against plan payments." Mont-

gomery Court's plan, however, does not propose to "credit" the payments against Greyhound's principal and interest twice. Rather, the Plan proposes to *increase* Greyhound's secured claim by the amount of the postpetition payments. Because Greyhound's total allowed claim remains constant, the net effect is an increase in Greyhound's allowed secured claim and a corresponding decrease in its allowed unsecured claim.

Application of the postpetition payments occurs only once as a "credit" against payments proposed by the Plan for Greyhound's secured claim. Greyhound contends, however, that the postpetition payments were made as adequate protection to compensate Greyhound for a decline in the value of its security during the Chapter 11 case. As such, Greyhound concludes that it is improper for Montgomery Court to apply those payments to the debt.

If the property in which Greyhound holds a security interest has declined in value during the pendency of Montgomery Court's Chapter 11, then Greyhound's assertion would be accurate. *See United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Greyhound, however, did not establish any decline in the value of the Property caused by application of the automatic stay or by the debtor's use of the Property. Instead, Greyhound bases its conclusion on a comparison between Montgomery Court's estimated net operating income based upon data supplied in June 1991 and revised projections based upon data supplied in January 1992. Although Greyhound's calculation of NOI from these two sets of data used an acceptable capitalization rate, that calculation did not include adjustments for projected replacement reserves. Greyhound's calculations are, therefore, somewhat flawed. More importantly, however, those calculations were presented as evidence only in the form of an exhibit (Greyhound exhibit N) and were not clarified or supported by testimony. Montgomery Court's projected net operating income in June 1991 was slightly higher than the NOI projected in January 1992. Without explanation for that variation, the decrease alone does not establish that the Property has declined in value since the petition date. In short, Greyhound's contention that the Property has declined in value during the Chapter 11 case is not supported by the evidence adduced at the confirmation hearing. Therefore, those postpetition payments cannot be characterized as adequate protection payments. *Timbers*, 484 U.S. at 365, 108 S.Ct. at 626.

Proper characterization of the postpetition payments made by Montgomery Court to Greyhound begins with the parties' agreed cash collateral order. That order provides for monthly pass-through payments to Greyhound up to the amount of the monthly payment specified under the promissory note. Any additional payments from one half of excess net rents were to "be applied against Greyhound Financial's claim." (Stip.Order p. 7, entered Feb. 14, 1991.) Although this language is not determinative, it is of some assistance, and shows that the parties clearly contemplated that these payments were not merely for adequate protection, but are related to Greyhound's claim.

Montgomery Court's proposed application is similar to the debtor's proposal in *Fairfax Savings v. Sherwood Square Assoc. (In re Sherwood Square Assoc.)*, 87 B.R. 388 (Bankr.D.Md.1988). The debtor in *Sherwood Square* proposed to "credit" certain postpetition payments to its major secured lender against initial payments due that lender under its plan. The Court found, in reliance upon *Timbers*, that "the purpose of adequate protection is to assure the secured creditor that it will ultimately realize the value of its collateral." *Sherwood Square*, 87 B.R. at 393. The court concluded that the application of cash collateral payments is consistent with that requirement and permits the secured claim holder to receive the present value of its allowed secured claim as required under 11 U.S.C. § 1129(b)(2)(A)(i)(II). *Sherwood Square*, 87 B.R. at 394.

This Court agrees with the reasoning of *Sherwood Square*. Montgomery Court's postpetition payments to Greyhound are in

the nature of an advance on the obligation to pay the present value of the allowed secured claim over time. Montgomery Court was not free to use those net rents, absent Greyhound's consent, because they were cash collateral. Because the collateral is cash, adequate protection would have been required for its use. Montgomery Court could have held the cash without using it, however, and then paid it out over time after confirmation. Such payments would have required application of a discount factor for the delay in payment. The prepayment eliminates that requirement because the claimant has had the use of the funds. In essence, Greyhound began receiving its deferred stream of payments prior to confirmation.

### c. The Discount Factor to be Applied to Deferred Cash Payments.

Subsection (A)(2)(i)(II) of § 1129(b)(2) contemplates that a dissenting class of secured claims will receive a value, as of the effective date of the plan, of at least the value of the secured claim. As the legislative history reflects, this requirement recognizes the concept of the "time-value" of money. H.R. 595, 95th Cong., 2d Sess. 413 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Clearly, dollars received today have greater value than the same amount of dollars received in the future. If payment is delayed, compensation for that delay is required. Accordingly, unless a plan provides for payment of the full amount of a secured claim on the effective date, the proposed payment stream must be "discounted" to the present value of the allowed secured claim.

This requirement is mirrored in 11 U.S.C. § 1325(a)(5)(B). The Court of Appeals for the Sixth Circuit has held that this section requires the Bankruptcy Court "to assess interest on the secured claim for the present value of the collateral (if it is not to be paid immediately) in order not to dilute the value of that claim through delay in payment." *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 429 (6th Cir.1982).

An appropriate discount factor assures that the value of the secured claim will not be diluted.

The *Memphis Bank* court determined that an appropriate discount rate for secured claims in a chapter 13 plan would be "the current market rate of interest used for similar loans in the region." 692 F.2d at 431. The court assumed that "[b]ankruptcy courts are generally familiar with the current conventional rates on various types of consumer loans." *Memphis Bank*, 692 F.2d at 431. In essence, this interpretation "requires the creditor to make a new loan in the amount of the value of the collateral ... and the creditor is entitled to interest on his loan." *Memphis Bank*, 692 F.2d at 429.

Although *Memphis Bank* was a Chapter 13 case, the language and purpose of 11 U.S.C. § 1325(a)(5)(B)(ii) is similar to that of § 1129(b)(2)(A)(i)(II). Therefore, under controlling case law in this circuit, the discount rate to be applied to a secured claim paid over time in Chapter 11 has been found to be equal to "the current market rate of interest used for similar loans in the region." *See In re Aztec Company*, 99 B.R. 388, 390 (Bankr.M.D.Tenn.1989); *In re Memphis Partners*, 99 B.R. 385 (Bankr. M.D.Tenn.1989).

Greyhound contends that because no market exists for the type of loan Montgomery Court proposes to force upon it,[5] the discount rate must be increased to reflect the high loan-to-value ratio and the financially distressed status of the debtor. The loan is required to be made by the "cram down" provisions of Chapter 11, however. *See Memphis Bank*, 692 F.2d at 427. No sound legal or policy argument can be advanced for increasing the discount factor because the debtor is a debtor or because the loan-to-value ratio is established by the Bankruptcy Code. If a plan of reorganization is feasible, qualification of the borrower is established. Under the facts of this case the discount factor then must be equal to interest charged in the

**5.** In its posthearing brief, Greyhound acknowledges that under *Memphis Bank* the appropriate discount rate is the current market rate of interest.

est. Thus, Greyhound apparently takes issue only with Montgomery Court's proposed rate as not being a market rate of interest.

market place for a commercial loan which is secured by a multi-use apartment facility. That rate includes compensation for inherent risks associated with a particular loan.

Mr. Pausch provided most of the debtor's expert testimony regarding the appropriate discount factor. His testimony established that the discount rate of 9.825% proposed by Montgomery Court is somewhat higher than a market rate of interest under any of four acceptable methods used. (Tr. I–113, I–121). The approach Mr. Pausch relied on primarily began with the interest rate provided under the original note with Greyhound. To that original rate, Mr. Pausch testified that he added a risk premium "—a premium paid for a fixed rate loan versus a variable rate loan." (Tr. I–115). With that addition for "risk premium," Mr. Pausch concluded that 9.825% is an appropriate market rate of interest in this case.

■■■ Throughout this proceeding, Greyhound expresses concern that it will lose its bargained-for variable rate of interest. Because the language in § 1129(b)(2)(A)(i)(II) calls for a present value analysis rather than an interest rate application, this result follows. Montgomery Court, however, has recognized Greyhound's concern and has increased a market fixed percentage by 1.92% to reflect increased risk imposed by elimination of the variable rate. (Testimony of Robert Pausch Tr. I–115).

Greyhound contends that the rate proposed by Montgomery Court is not a market rate as required by *Memphis Bank*. However, Greyhound presented no credible evidence of any other appropriate rate. The only evidence it offered was an unsupported statement that it needed 12.46% to "break even." (Testimony of Jill Carabelli II–180). Without additional foundation, however, that statement does not credibly establish a market rate of interest which would be required as a discount factor.

Based upon the evidence, the Court finds that the discount factor of 9.825% proposed by Montgomery Court satisfies the present value requirement of § 1129(b)(2)(A)(i)(II) and expresses such factor as a market rate of interest as required by *Memphis Bank*.

### 2. The Statutory Mandate for a Dissenting Unsecured Class.

When a class of unsecured claims rejects a plan of reorganization, subsection (B) of § 1129(b)(2) sets forth certain required treatment. "Fair and equitable" treatment in this circumstance requires the Plan to provide either:

(i) [t]hat each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).

The Plan does not provide that Greyhound will receive the present value of its unsecured claim. That claim has been separately classified and that class is presumed to have rejected the plan. Although the Plan proposes payment of the full amount of Greyhound's unsecured claim upon the earlier of December 3, 2000 or from any proceeds derived from refinancing or sale of the Property, that deferred cash payment carries a discount factor of 4%, payable annually only if cash flow permits. Neither party argued that 4% would be adequate to compensate Greyhound for the passage of time until its claim is paid. Therefore, with regard to the class which includes only Greyhound's unsecured claim, Montgomery Court must proceed under § 1129(b)(2)(B)(ii). That subsection describes fair and equitable in terms of the "absolute priority rule."

### a. The Absolute Priority Rule Generally.

Simply stated, the absolute priority rule means "that 'the stockholder's interest in the property is subordinate to the rights of creditors; first of secured and then of unsecured creditors.'" *Case v. Los Angeles Lumber Products Co. Ltd.*, 308 U.S. 106, 116, 60 S.Ct. 1, 7, 84 L.Ed. 110 (1939), quoting *Louisville Trust Co. v. Louisville, New Albany and Chicago Railway Co.*,

174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130 (1899). Holders of junior claims or interests cannot receive distributions under a proposed plan unless senior creditors have been fully paid. *In re 222 Liberty Associates*, 108 B.R. 971, 983 (Bankr.E.D.Pa. 1990). "[T]he retention of the 'fair and equitable' standard in cram-down situations serves the equitable end that a creditor class should only be forced to accept a plan over its objection upon assurance that it will not, in the process, be forced to surrender its rights to satisfaction of its claims out of the assets of the estate to junior interests." *In re Greystone III Joint Venture*, 102 B.R. 560, 574 (W.D.Texas 1989), *rev'd* on other grounds, 948 F.2d 134 (5th Cir.1992).[6]

The Supreme Court of the United States recognized in *Case* that, despite the absolute priority rule, in certain circumstances equity holders "may participate in a plan of reorganization of an insolvent debtor." 308 U.S. at 121, 60 S.Ct. at 10. *See, also, Northern Pacific Railway Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913) and *Kansas City Terminal Railway Co. v. Central Union Trust Co.*, 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926). The *Case* court stated: "Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made." *Case*, 308 U.S. at 121, 60 S.Ct. at 10.

This concept has been called "the new value exception" to the absolute priority rule. Courts are divided, however, as to the continuing validity of this exception after the passage of the Bankruptcy Reform Act of 1978 ("Bankruptcy Code"). Some courts continue to recognize the "new value" concept. *See Teamsters National Freight Negotiating Committee v. U.S. Truck Company, Inc. (In re U.S. Truck)*, 800 F.2d 581, 588 (6th Cir.1986); *222 Liberty Associates*, 108 B.R. at 983 and

*The Penn Mutual Life Insurance Company v. Woodscape Limited Partnership (In re Woodscape Limited Partnership)*, 134 B.R. 165, 173 (Bankr.D.Md.1991). Others have concluded that the Bankruptcy Code, by codifying the absolute priority rule and permitting consensual confirmation without adherence to its principles, did not codify and, thus, eliminated the "new value exception." *See generally, In re Outlook/Century, Ltd.*, 127 B.R. 650 (Bankr.N.D.Calif.1991) and *In re Lumber Exchange Limited Partnership*, 125 B.R. 1000 (Bankr. D.Minn.1991), *aff'd*, 134 B.R. 354 (D.Minn. 1991).

Whatever the result might be if an analysis of the "new value" controversy were undertaken, the controlling court in this circuit has assumed the continuation and survival of the concept of "new value." *U.S. Truck*, 800 F.2d at 588. As characterized by one court, the *U.S. Truck* decision "aggressively embraced" the "new value exception." *In re Creekside Landing, Ltd.*, Case No 3–90–03614 at 356 (Bankr. M.D.Tenn.1992) (Attached as exhibit C). Where the shareholder gives up its prior interest and participates in the reorganized company only because of new equity contributions, the shareholder is not retaining an interest because of its old interest, but is, in essence, purchasing a new interest. *U.S. Truck*, 800 F.2d at 588. *See, generally, Woodscape*, 134 B.R. 165.

In this sense, the phrase "new value *exception*" inaccurately characterizes the issue. *See Woodscape*, 134 B.R. 165; *Greystone*, 102 B.R. at 574 and *Creekside* at 356. "A more accurate characterization is that the contribution of new capital in money or money's worth, in return for a future participation in an enterprise which is reasonably equivalent to the contribution, simply does not violate the absolute priority rule." *Woodscape*, 134 B.R. at 173. Thus, instead of creating an exception to the absolute priority rule, the contri-

---

**6.** The bankruptcy court's decision was affirmed in *Phoenix Mutual Life Insurance Company v. Greystone III Joint Venture (In the Matter of Greystone III Joint Venture)*, 127 B.R. 138 (W.D.Texas 1990). The Fifth Circuit Court of Appeals initially reversed the district court's de- cision at 948 F.2d 134 (5th Cir.1991). On February 27, 1992, sitting *en banc*, the circuit court withdrew and deleted the portion of its earlier opinion relating to the absolute priority rule. 948 F.2d 134.

bution of new capital and a corresponding repurchase of ownership rights merely may not violate it. This Court agrees and adopts the characterization of the court in *Creekside* that "the new value 'exception' is thus really an 'exclusion' from application of the absolute priority rule" (*Creekside* at 356).

■ The purchase of new equity by old equity holders must satisfy three tests, however, before it can be accepted as non-violative of the absolute priority rule. The new contribution must be necessary, it must be in money or money's worth, and the participation afforded to the contributors must be reasonably equivalent to the new capital contributions. *See Case*, 308 U.S. at 121–122, 60 S.Ct. at 10; *Greystone*, 102 B.R. at 577; *222 Liberty Assoc.*, 108 B.R. at 984; *Woodscape*, 134 B.R. at 174. These requirements are intended to insure that small, unnecessary contributions by existing equity do not undermine or eviscerate the absolute priority rule.

Therefore, under *Case* and its progeny, for former equity holders to participate in acquiring ownership of a reorganized debtor through the contribution of new capital, the evidence must establish that: (1) the new contributions are necessary to the ongoing business needs of the debtor, (2) the contributions are in money or money's worth and (3) the interests and future participation of former equity holders are "reasonably equivalent to their contribution." 308 U.S. at 121, 60 S.Ct. at 10 and *U.S. Truck*, 800 F.2d at 588. Proof of these elements is factual. *Woodscape*, 134 B.R. at 175. Accordingly, while this Court recognizes that former equity holders may participate in a reorganized debtor if certain requirements have been met, the facts of each case must support the application of this theory.

b. Application of the Absolute Priority Rule to Montgomery Court's Plan.

■ The Plan provides that two classes of equity interests will receive an interest in Montgomery Court. One class consists of the general partner interest of CII; the other class consists of the interests of Montgomery Court's existing Limited Part-

ners. Each class of interest holders is to contribute money to Montgomery Court. The form of these capital contributions differs, however.

(1) *The General Partner Interest.*

The Plan proposes that CII will contribute $6,923 as "an amount equal to its pro rata portion of the total contributions required of all partners." (Amended Plan § 5.03). Payment of this contribution is to be satisfied by a partial offset against the administrative expense entitlement CII asserts for postpetition services it rendered in this case. Greyhound did not specifically object to or address this proposal.

Montgomery's Court amended disclosure statement calls for CII to request an administrative expense allowance for certain costs incurred in this Chapter 11 case. However, no such request has been made. CII did not present evidence establishing the validity or amount of any entitlement to an administrative expense. Without such support the Court cannot determine whether the proposed offset is appropriate or whether CII's purchase of ownership rights in the reorganized Montgomery Court by such offset is consistent with the absolute priority rule imposed by § 1129(b)(2)(B)(ii). Nor is it clear what interest in the reorganized Montgomery Court is being purchased by the contribution. Accordingly, the Court must find that the Plan fails to satisfy the absolute priority rule with respect to CII's retained interest in Montgomery Court.

(2) *The Limited Partner Interests.*

The Plan gives each Limited Partner the opportunity to provide additional capital and thereby receive an interest in the reorganized debtor. If the new capital is not paid and "cram down" is sought under 11 U.S.C. § 1129(b)(2), the Limited Partner's interest is extinguished. Limited Partners who contribute the requested $2,000 per unit are to receive a "10% cumulative annual return on the capital contribution. Payments will be made only when the Property is sold or refinanced." (Amended Plan § 4.07).

**(A) Necessity.**

A primary purpose for excluding new value contributions from the operation of the absolute priority rule is to ensure that a reorganized debtor is sufficiently recapitalized. "[I]t still takes cash to run any enterprise and the cash flow of the enterprise is frequently inadequate to the task." *Greystone*, 102 B.R. at 575. The contribution must be necessary, and not merely a "token" to protect the intent of the absolute priority rule. 102 B.R. at 575.

Necessity is factually based. Because each Partnership Debtor has its own "plan economics" and projections, the necessity for fresh capital contribution must be established in each case.

Montgomery Court uses the $24,000 contribution from existing Limited Partners to meet payments proposed under the Plan. Testimony established that this contribution is necessary to establish an operating reserve and to pay current obligations. (Testimony of Mr. Pausch Tr. I–124). Testimony further established that such an operating reserve would be necessary for any ongoing business to protect against possible fluctuations in income and expenses. (Tr. I–124–125). Without the capital contributions from the Limited Partners, that reserve could not be established. (Tr. I–124).

The Court finds that the contributions by Montgomery Court's Limited Partners are necessary to Montgomery Court's viability as a going concern. The operating reserve initially established with these contributions is an integral part of Montgomery Court's Plan. The reserve protects the interests of existing and future creditors and is essential to the Plan's feasibility. Because Montgomery Court has previously experienced shortfalls in operating income, protection against further shortfalls is essential.

**(B) Money or Money's Worth.**

The contributions of the Limited Partners are in the form of cash. That cash has been placed into an escrow account held by Montgomery Court's counsel and is available for immediate use at confirmation. Therefore, the requirement that such contributions be in money or money's worth is met.

**(C) Future Participation as Reasonably Equivalent to the Contributions.**

The requirement that new cash contributions be reasonably equivalent to the future participation being purchased insures that "equity holders will not eviscerate the absolute priority rule by means of gratuitous, token cash infusions proposed primarily to 'buy' cheap financing." *Greystone*, 102 B.R. at 575. This requirement also recognizes, however, that equity contributors have a reasonable expectation of future participation in the debtor.

There are no clear guidelines for determining if a contribution is reasonably equivalent to the interest retained. Courts are not consistent in their approaches. *See In re Bjolmes Realty Trust*, 134 B.R. 1000, 1008 (Bankr.D.Mass.1991). The determination is factually intense and must be made on a case-by-case basis. Montgomery Court has not offered sufficient facts for this Court to make that determination.

Greyhound's assertion is correct that the Plan "fails to provide information regarding the aggregate value of the shareholders' retained interest in the reorganized debtor and the shareholders' new capital investment" (Greyhound's Post–Confirmation Hearing Brief p. 19). An important component of whether the new cash contribution is reasonably equivalent to the future participation is the "reorganization value" of the reorganized debtor. *See Future Energy*, 83 B.R. at 499; *Bjolmes*, 134 B.R. at 1008; *see, generally,* Pachulski, *The Cram Down and Valuation Under Chapter 11 of the Bankruptcy Code*, 58 N.C.L.Rev. 925, (1980).

Montgomery Court did not sufficiently address this issue in its Plan and failed to produce any evidence at the confirmation hearing of "reorganization value," whatever that term may mean in this context. The legal and factual issues involved in this determination are too complex to be decided in a vacuum. Evidence is essential to

establish that the value of the future participation in the reorganized debtor is reasonably equivalent to the new cash contributed. The Court cannot address the issue until such evidence is provided. The burden is on the debtor, as the plan proponent, to establish that all requirements for confirmation have been met. *In re The Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986). With respect to this last prong of the absolute priority rule, Montgomery Court has not met that burden.

### 3. *The General Requirements of "Fair and Equitable" Under 11 U.S.C. § 1129(b).*

In addition to the specific codified requirements of "fair and equitable," there is a general requirement that a plan be "fair and equitable, with respect to each class" of impaired dissenting claims or interests. Mere compliance with the specific treatment required by § 1129(b)(2)(A) and (B) "does not assure that the plan is 'fair and equitable.'" *Federal Savings and Loan Ins. Corp. v. D & F Construction, Inc., (In the Matter of D & F Construction Inc.),* 865 F.2d 673, 675 (5th Cir.1989). As with many other provisions of 11 U.S.C. § 1129, satisfaction of this requirement depends on specific facts.

■ A proponent seeking confirmation of a plan on a nonconsensual basis must convince the Court that the terms of the plan treat the dissenting class fairly and do not unduly shift the risk of reorganization. That inquiry is likely to include an analysis of some of the following factors as they are relevant to the dissenting class:

(1) whether the statutory mandates of § 1129(b)(2)(A) or (B) have been met;

(2) whether for a secured class, the valuation process has been fair;

(3) whether the primary risk of reorganization remains with the equity interests of the reorganized debtor;

(4) whether any secured loan restructure, including default provisions and other covenants, is reasonable when compared to the parties' previous understandings and practices;

(5) whether the length of time until proposed repayment is reasonable;

(6) whether, for an unsecured class, the percentage or formula for proposed payment demonstrates a good faith effort to repay those obligations; and

(7) whether other particular inequities exist, including special prejudice to a dissenting class arising from its particular circumstances.

Greyhound raises numerous arguments to support its assertion that Montgomery Court's Plan is not "fair and equitable." Those arguments generally were merely statements, unsupported by any factual basis and not specifically related to the treatment proposed for Greyhound's secured or unsecured claim. Instead, the assertions made clear Greyhound's dislike of the Chapter 11 process. However, mere dissatisfaction with the Chapter 11 remedy does not establish that a plan is unfair and inequitable.

The Court has determined that the statutory mandate of § 1129(b)(2)(A) has been met with regard to the rejecting class of secured claims. Additionally, the Court has found that the value proposed by the Plan for the Property and the calculation of the secured claim is permissible as proposed. Payment or return on new equity interests only after all creditor interests are paid as proposed by the Plan causes the primary risk of reorganization to remain with the new equity interests. The statutory mandate of § 1129(b)(2)(B) has not been met for the rejecting unsecured class.

Greyhound contends that the Plan denies Greyhound its rights under its note and mortgage and that the loan restructure and payment schedule, as proposed, are unreasonable. Specifically, Greyhound is dissatisfied with the delay in repayment caused by the application of previously paid rents to initial payment requirements and by its "diminished" right to foreclose.

■ The Plan proposes only to pay interest on Greyhound's allowed secured claim for the first year and those interest "payments" are largely made by credits against previous payments. Excessive delay in amortization of a restructured loan

may shift too much risk to the secured lender and, thus, may be unfair and inequitable. *See In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935); and *D & F Construction*, 865 F.2d at 676. Here, however, Montgomery Court begins to amortize Greyhound's secured claim approximately 13 months after confirmation. No negative amortization occurs during this period because Greyhound had no entitlement to interest during the postpetition, preconfirmation period and those payments are being applied to postconfirmation requirements. When the preconfirmation period of one and a half years is added to the postconfirmation delay in payments against principal, the issue becomes more difficult. However, because Montgomery Court filed its Plan after approximately eight months, the remaining delay resulted from the disclosure statement and confirmation process and this Court's schedule. When the totality of the proposal is considered, including the eight year term of the new loan as compared to the seven year term of the original note, the Court finds that the delay in reamortization and the new loan covenants are not inherently unfair or inequitable.

■ Under the Plan, Montgomery Court will have sixty (60) days after written notice to cure a payment default to Greyhound under the Plan or 30 days to cure a nonpayment default. Greyhound contends that these periods are too long. Greyhound's witness testified that in the normal course of business, notice from the lender to a borrower of a default for nonpayment might not occur until after 45 days after that default. (Testimony of Jill Carabelli II–185–191). Based upon that testimony, Montgomery Court's proposed cure periods are reasonable and "fair and equitable" under 11 U.S.C. § 1129(b).

The Plan proposes full payment to Greyhound of the face amount of its unsecured claim at a 4% discount factor, payable either from excess net income or upon sale or refinancing of the property. Such a proposal certainly cannot be lacking in good faith effort to repay the obligation.

Finally, Greyhound argues that there are particular inequities here because Montgomery Court's records are not reliable and because it does not provide good management for the Property. The Court is certainly aware that the records of the Partnership Debtors have not always been reliable. Great effort has been made to improve that circumstance, however, and without evidence of current unreliability, past problems will not prevent a reorganization which has been shown to be feasible. Mismanagement allegations also require evidentiary proof. No such evidence was adduced. Therefore, those objections do not demonstrate other particular inequities or special prejudice which cause the Plan to be unfair or inequitable in its treatment of Greyhound.

C. Unfair Discrimination.

A further requisite of "cram down" confirmation is the lack of unfair discrimination. In this regard, Greyhound asserts that Montgomery Court exercised too much discretion in its determinations of variables such as income and expenses, rate of return, market rate of interest and the market value of the Property. Specifically, Greyhound states in its posthearing brief that "debtor exercised its discretion in its and CII's favor and against [Greyhound] and other third party creditors in the case." (Posthearing Brief of Greyhound at p. 20). Greyhound did not effectively discredit Montgomery Court's evidence or present any independent credible evidence in these areas, however. A plan proponent is entitled to use its discretion so long as the evidence supports that discretion and the discretion is exercised within the bounds of the law. The Court has already found that Montgomery Court's projections are supported by the record and that the discount factor proposed satisfies the legal standard in this circuit. Consequently, Greyhound's "abuse of discretion" contentions do not establish any unfair discrimination.

Greyhound further contends that it is not "fair" that Montgomery Court proposes to pay Cardinal affiliate unsecured claims on a *pro rata* basis with Greyhound's unsecured claim. Greyhound offers no evi-

**348**

dence why this is inappropriate and has not sought disallowance or subordination of those claims. A determination as to the amount and validity of those affiliate claims has been sought by separate motion in this case. If such claims are disallowed or subordinated, Greyhound's position would prevail, however. The Plan should reflect this possibility. Although argued by Greyhound as unfairness, this issue is more properly one related to the absolute priority rule requirements of § 1129(b)(2)(B).

Lastly, Greyhound contends that the Plan unfairly discriminates against all third-party creditors. This objection relates to the release of the Cardinal affiliates from certain obligations to Montgomery Court when other creditors are not granted analogous benefits. Because the Court is unable from the state of the record or the provisions of the Plan to determine precisely what obligations are proposed to be released, this aspect of the Plan cannot be ruled upon at this time.

Greyhound did not raise or argue "unfair discrimination" arising from the separate classification of Greyhound's allowed unsecured claim and the Court, therefore, makes no finding on that issue.

## V. CONCLUSION

Based upon the foregoing, the Court finds that Greyhound's objection to confirmation is sustained in part and overruled in part. The portions of the objection sustained and some independent findings by the Court require that confirmation of the Plan proposed by Montgomery Court must be, and the same is, hereby denied.

IT IS SO ORDERED.

---

## EXHIBIT A
### OPINION AND ORDER ON OBJECTION TO CONFIRMATION OF CHAPTER 11 PLAN

| | Page |
|---|---|
| I. FACTS | 327 |
|   A. The Relationship Between Montgomery Court and the Cardinal Enterprise | 327 |
|   B. The Relationship Between Montgomery Court and Greyhound | 327 |
|   C. Plan Provisions | 328 |
|   D. Plan Voting | 329 |
| II. ISSUES PRESENTED AND SCOPE OF THE DECISION | 329 |
| III. DISCUSSION AND CONCLUSIONS OF LAW UNDER 11 U.S.C. § 1129(a) | 329 |
|   A. Uncontested, Satisfied or Inapplicable Confirmation Elements [§ 1129(a)(4), (5), (6), (9), (10), (12), (13)] | 329 |
|   B. Contested Confirmation Elements [§ 1129(a)(3), (7), and (11)] | 330 |
|     1. Good Faith [§ 1129(a)(3)] | 330 |
|     2. Comparison with Liquidation Under Chapter 7 [§ 1129(a)(7)] | 330 |
|     3. Feasibility [§ 1129(a)(11)] | 331 |
|       a. Generally | 331 |
|       b. Arithmetic Feasibility | 332 |
|       c. Realistic Projections | 332 |
|         (1) Income | 333 |
|         (2) Expenses | 333 |
|       d. Postpetition Performance | 334 |
|       e. Conclusion on Feasibility | 335 |
|   C. The Remaining Confirmation Elements [11 U.S.C. § 1129(a)(1), (2) and (8)] | 335 |
|     1. Compliance With Title 11 [§ 1129(a)(1) and (2)] | 335 |
|     2. Acceptance or Non–Impairment [§ 1129(a)(8)] | 336 |
| IV. DISCUSSION AND CONCLUSIONS OF LAW UNDER 11 U.S.C. § 1129(b) ("CRAM DOWN") | 336 |
|   A. Generally | 336 |
|   B. The Fair and Equitable Standard | 336 |
|     1. The Statutory Mandate for a Dissenting Secured Class | 336 |
|       a. The Secured Claim | 337 |

|  | Page |
|---|---|
| (1) The Value of the Property | 337 |
| (2) The Extent of Greyhound's Interest | 338 |
| (A) Deduction From Property Value for Hypothetical Liquidation Or Transfer Costs | 338 |
| (B) Application of Postpetition Payments | 339 |
| b. Deferred Cash Payments | 339 |
| c. The Discount Factor to be Applied to Deferred Cash Payments | 341 |
| 2. The Statutory Mandate for a Dissenting Unsecured Class | 342 |
| a. The Absolute Priority Rule Generally | 342 |
| b. Application of the Absolute Priority Rule to Montgomery Court's Plan | 344 |
| (1) The General Partner Interest | 344 |
| (2) The Limited Partner Interests | 344 |
| (A) Necessity | 345 |
| (B) Money or Money's Worth | 345 |
| (C) Future Participation as Reasonably Equivalent to the Contributions | 345 |
| 3. The General Requirements of "Fair and Equitable" Under 11 U.S.C. § 1129(b) | 346 |
| C. Unfair Discrimination | 347 |
| V. CONCLUSION | 348 |

EXHIBIT B

United States Bankruptcy Court

Southern District of Ohio

Eastern Division

Case No. 2–91–04058

SSAN: 296–36–6124

292–40–0906

In re Richard Weber and Geraldine Weber, Debtors.

OPINION AND ORDER ON OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN

I. *Preliminary Matters*

This matter is before the Court on the requested confirmation of a Chapter 13 plan proposed by debtors Richard and Geraldine Weber. Avco Financial Services, Inc. ("Avco") filed an objection to confirmation in which it challenges the treatment proposed for its allowed claim.

The Court has jurisdiction in this contested matter under 28 U.S.C. § 1334 and the general order of reference previously entered in this district. This is a core proceeding which this bankruptcy judge may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(L).

The debtors' plan, as amended, proposes in part to pay $938 each month to the Chapter 13 trustee for payment in full of allowed secured and priority unsecured claims, and a dividend of 11% to allowed general unsecured claims. Avco holds a note obligation secured by a second mortgage against the debtors' residence. That note calls for payments of $386.61 each month over a term of five years at an annual percentage rate of 20.30%. Under the plan, as proposed, Avco is to retain its lien and be paid its allowed secured claim with a 10% discount factor. Any obligation to Avco in excess of its allowed secured claim is to be allowed and paid as unsecured at the 11% dividend.

II. *Issues To Be Determined*

There are three issues to be decided. First, the Court must determine whether the debtors' plan, which proposes to retain the residence, may reduce the value of the collateral securing Avco's claim by hypothetical costs of sale or transfer prior to determining Avco's secured claim. Second, if such deduction is permitted, the Court

must decide whether Avco's claim, which is secured only by a mortgage against the debtors' residence, can be bifurcated into allowed secured and unsecured components. Third, if bifurcation is permitted, the Court must determine the appropriateness of the specific treatment proposed for Avco's secured claim under the plan.

### III. *Legal Discussion And Conclusions Of Law*

#### A. *The Deduction for Costs of Sale or Transfer*

Sections 1325(a)(5)(B) and 506(a) of Title 11 are the statutory provisions relevant to the process of determining the extent of Avco's claim which is secured. Section 1325(a)(5)(B) mandates certain treatment of an allowed secured claim in a Chapter 13 plan if the holder of that claim has rejected the debtors' plan. In applicable part that statute states:

> (a) [T]he court shall confirm a plan if—
>
> .    .    .    .    .
>
> (5) with respect to each allowed secured claim provided for by the plan—
>
> .    .    .    .    .
>
> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; ...

11 U.S.C. § 1325(a)(5)(B) (1992).

The debtors' plan proposes that Avco retain its lien and that its secured claim be paid in full with a discount factor of 10%. Avco has rejected this plan. Therefore, one focus of the dispute must be whether the amount of the claim proposed to be paid over time with a discount factor is "not less than the allowed amount of such claim."

Avco's total claim is $15,200.46. The fair market value of the real property securing Avco's claim has been appraised at $65,000.

Avco does not contest that value. There is a prior first mortgage against the property in an approximate amount of $46,170.00. Therefore, Avco contends that its allowed secured claim is at least as much as its debt of $15,200.46 and it is, therefore, fully secured.

The debtors, however, maintain that Avco's secured claim does not exceed $12,330. That calculation presumes subtraction of 10% from the appraised value of the property for costs of sale or transfer as well as subtraction of the first mortgage debt. The plan does not specifically propose to sell the property. Because the dividend proposed for allowed unsecured claims is 11%, to the extent Avco's claim is not allowed as secured, the debtors propose to pay Avco at that dividend percentage as an allowed unsecured claimant.

Although § 1325(a)(5)(B) mandates certain treatment for an allowed secured claim if the holder of that claim rejects the plan, § 506 of the Bankruptcy Code governs the allowance process for the secured status of a claim in cases filed under any chapter of the Bankruptcy Code.[1] The subsection of § 506 implicated in this matter is (a), which states in applicable part:

> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, ... is a secured claim to the extent of the *value of such creditor's interest in the estate's interest in such property,* ... and is an unsecured claim to the extent that the value of *such creditor's interest* ... is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property,* and in conjunction with any hearing on such disposition or use or on a plan affecting *such creditor's interest.*

11 U.S.C. § 506(a) (1992) (Emphases added.)

Case law divergence on this issue is attributable to the resolution chosen by a particular court of a perceived internal inconsistency between the language underlined in sentence 1 of § 506(a) and that

---

1. *See* 11 U.S.C. § 102(a) (1992).

underlined in sentence 2 of that section. If the secured claim is viewed as described in the first sentence of § 506(a), as "the creditor's interest in the estate's interest in such property," a deduction for costs of sale or transfer is usually authorized. *See, e.g., In re Claeys*, 81 B.R. 985, 990–992 (Bankr. D.N.D.1987). On the other hand, courts which hold that the debtor's intention to retain the collateral (the "proposed disposition") also causes variance in the extent of the creditor's interest as well as in the value of the collateral, have not authorized subtraction of such costs. *See, e.g., Brown & Co. Securities Corp. v. Balbus (In re Balbus)*, 933 F.2d 246 (4th Cir.1991).

This Court believes that it is always the value of the creditor's interest in the estate's interest in the property which is the focus for determining the amount of an allowed secured claim pursuant to § 506(a). The issue is not the standard to be used to value the collateral in connection with a Chapter 13 plan. Rather, the extent of the estate's interest in the property is the starting point for determining the extent of the creditor's lien interest which is secured by value in the property against which the lien operates.

The courts generally agree that reduction of collateral value for costs of sale or transfer reflects a creditor's expectation that realization on its security requires associated costs. These costs may arise from repossession and foreclosure or from voluntary sale to a subsequent owner. Only when the creditor is in the business of selling the type of collateral which secures its debt, can a creditor in a consumer case seriously argue that recourse to its collateral to satisfy its debt would result in actual costs of transfer or sale which would be less than approximately 10% of the collateral's value. That reality has been recognized in this district in consumer cases since 1981. *See In re Neal*, 10 B.R. 535 (Bankr.S.D.Ohio 1981); *In re Paige*, 13 B.R. 713, 715 (Bankr.S.D.Ohio 1981).

The language in sentence two of § 506(a) does not change this reality. Although the value of the collateral and, corresponding-ly, the *amount* of the creditor's allowed secured claim may vary according to the intended use of the property or the purpose for which the valuation is made, the nature or relative extent of the creditor's interest in that property does not change. If a Chapter 13 debtor is retaining property subject to a valid lien, the standard used to value that property will be between liquidation and retail value for personal property and close to fair market value for real property. *See In re Damron*, 8 B.R. 323 (Bankr.S.D.Ohio 1980).

On the other hand, if a debtor enters Chapter 7 with accounts receivable as collateral for a creditor's claim and that secured claim is to be allowed for payment from the estate because the trustee in bankruptcy is to liquidate the accounts, the value of those accounts will vary considerably depending upon whether the trustee intends to sell the business as a whole or separate the accounts and sell them separately at a liquidation sale. If such accounts are to be utilized by a debtor in Chapter 13 in continuation of a business, their value will be higher than in either of the other situations. Likewise, real property to be liquidated quickly by a Chapter 7 trustee will be valued using a lower standard of valuation than would be used if the real property were to be retained by a debtor for sale under future market conditions. Such considerations cause variation in the "such value" in sentence two of § 506(a). In this sense, "such value" as used in sentence two of § 506(a) refers to the value of the property serving as collateral, but not to the extent of the creditor's interest in the property. The creditor's interest referenced in "such creditor's interest" at the end of sentence two, however, is the same interest intended by identical language in sentence one.

It can be seen, therefore, that the value of the property to which a creditor's lien attaches will vary with the purpose for the valuation or the proposed disposition of the property. However, the extent of the creditor's interest in that property will never exceed the value of the property, under any appropriate standard, minus costs associated with selling or transferring the property

and the amount of any senior liens. The equity to value ratios used by lenders recognize this fact. If the debt is not paid according to its terms and the creditor is forced to look to its collateral for satisfaction, there is a slippage between the value of the property, on whatever appropriate market or standard is chosen, and the amount the creditor will receive. It is the amount the creditor should reasonably be expected to realize if forced to look to its collateral that an allowed secured claim represents. That is expressed in sentence one of § 506(a). The changing standard of value recognized by the second sentence of that statute does not alter that result. Further, no legitimate policy would be advanced by permitting a secured creditor to improve its position with regard to realization of its collateral value merely because its debtor has filed a bankruptcy reorganization case.

In conclusion, the fairer result recognizes that a creditor's claim secured by a lien against property in which the estate has an interest must reflect transfer or sale costs which would always occur were the creditor forced to resort to the property for repayment. No argument has been advanced that 10% is an unreasonable estimate of those costs. Consequently, the Court sustains the debtor's proposal to subtract from the appraised value of the collateral prior to determining the amount of Avco's allowed secured claim, not only the amount of any mortgage or other lien prior to Avco's, but also an allowance for estimated transfer or sale costs.

### B. *Bifurcation of Avco's Claim*

The second part of Avco's objection challenges the debtors' use of 11 U.S.C. § 506(a) to bifurcate Avco's claim into secured and unsecured components. That challenge relies upon the language of 11 U.S.C. § 1332(b)(2).

Section 1322(b)(2) states in applicable part:

(b) [T]he plan may—

．　　．　　．　　．　　．

(2) modify the rights of *holders of secured claims*, other than a *claim se-*

*cured* only by a security interest in real property that is the debtor's principal residence . . .; (Emphases added). 11 U.S.C. § 1322(b)(2) (1992).

Case law is divided about the effect of § 1322(b)(2) on the bifurcation provisions required by § 506(a). One line of cases holds that § 506(a) and § 1322(b)(2) are inconsistent, the more specific provision of § 1322(b)(2) controls, and bifurcation is not permissible. *E.g., In re Chavez,* 117 B.R. 733 (Bankr.S.D.Fla.1990); *Robelman [Nobelman] v. American Svgs. Bank,* 129 B.R. [98] 101 (N.D.Tex.1991); *In re Catlin,* 81 B.R. 522 (Bankr.D.Minn.1987).

The other line of cases finds no inconsistency in the two provisions because the phrases "holders of secured claims" and "a claim secured only by" are interpreted as referring to a "secured claim" within the meaning ascribed to that status by § 506(a). If § 506(a) has been applied to a creditor's interest in property and that interest in property is found to be less than the creditor's entire claim, only the allowed secured claim or the portion of the total claim represented by available value in the collateral is protected by § 1322(b)(2). Under this line of authority, if the creditor's only security is the debtor's residential real property, the portion of the entire claim which is allowed as secured pursuant to § 506(b) may be treated in the plan as an allowed secured claim. The allowed unsecured claim is subject to modification along with unsecured claims generally. *E.g., In re Frost,* 96 B.R. 804 (Bankr.S.D.Ohio 1989), *aff'd,* 123 B.R. 254 (S.D.Ohio 1990); *In re Hart,* 923 F.2d 1410 (10th Cir.1991); *Hougland v. Lomas & Nettleton Co. (In re Hougland),* 886 F.2d 1182 (9th Cir.1989); *Wilson v. Commonwealth Mortgage Co.,* 895 F.2d 123 (3rd Cir.1970).

Bifurcation of an undersecured creditor's claim is a basic premise of the Bankruptcy Code. The language of § 1322(b)(2), which prohibits modification of the rights of a holder of a secured claim if the only security for the obligation is the debtor's residence, presupposes allowance of the secured claim pursuant to § 506(a). Had

Congress intended to prohibit modification of the rights of holders of *debts* secured either wholly or partially by the debtors' residential real estate, the provision would have been so drafted. That is not the language which appears in the statute. It is the secured claim, not the entire claim, that may not be modified. The Court sees no reason to ascribe a meaning to the terms "secured claim" or "claim secured" as such terms appear in § 1322(b)(2), which departs from the meaning of those terms elsewhere in the Bankruptcy Code. *See Dewsnup v. Timm* [— U.S. ——], 112 S.Ct. 773 [116 L.Ed.2d 903] (1992) (dissent generally at 780).

The Court finds that the protection provided by § 1322(b)(2) applies only to the secured claim of a creditor whose sole security is a debtor's residence. The bifurcation process mandated by § 506(a) applies to the creditor's claim and the modification restriction protects only the portion of that entire claim which is allowed as secured. This interpretation best comports with the meaning of both sections and interprets them in a manner which is internally consistent. Accordingly, the debtors' plan may provide for the application of § 506(a) and the resulting bifurcation of Avco's claim.

#### C. *Treatment of Avco's Secured Claim Under the Plan*

The debtors' plan permits Avco to retain its lien and proposes to pay Avco's secured claim over a period in excess of 55 months at a discount factor of 10%. Under the contract, however, the obligation to Avco requires monthly payments of $386.61 over a term of 60 months, beginning October 19, 1990, at an annual percentage rate of 20.-30%. The debtors argue, in essence, that the treatment proposed meets the confirmation test of § 1325(a)(5)(B) and that no more than that is required. Avco insists, on the other hand, that the protection against modification of its rights given by § 1322(b)(2) prohibits the proposed treatment.

The circumstances presented by this plan are not similar to those which formed the basis for earlier decisions in this district. *See, e.g., Neal,* 10 B.R. at 537–540 and *Paige,* 13 B.R. at 715. In those cases, the proposed treatment of the creditor's secured claim resulted in acceleration of repayment to the creditor. Here, Avco will receive a slower repayment under the plan than it is entitled to receive under its contract and at a discount factor which is significantly lower than the rate of interest under its loan. Such treatment is permissible for allowed secured claims in Chapter 13 generally. However, the benefit and protection conferred upon the holder of an allowed secured claim, the only security for which is the debtors' residence, means that the modification proposed by these debtors is prohibited. This is not a situation where full repayment of the allowed secured claim is accelerated. Clearly, the plan as proposed substantially and negatively modifies the claimant's rights in a manner prohibited by § 1322(b)(2).

#### IV. *Conclusion*

Based on the foregoing, Avco's objection to confirmation is sustained in part and overruled in part. The debtors have twenty (20) days from the service of this order to amend their plan consistent with this ruling and to correct other deficiencies, such as the length, which were noted by the Chapter 13 trustee at confirmation. If timely amendments are not filed or other appropriate action is not taken, the Court will dismiss the case.

IT IS SO ORDERED.

Dated: 4–6–92

> (s) B.J. Sellers
> B.J. Sellers
> United States Bankruptcy Judge

#### EXHIBIT C

In the United States Bankruptcy Court for the

Middle District of Tennessee

Case No. 390–03614

In re: Creekside Landing, Ltd., Debtor.

#### MEMORANDUM

Confirmation of this Chapter 11 plan is denied because the amended plan unfairly

discriminates against the unsecured claim of the Resolution Trust Corporation and violates the absolute priority rule. The following constitute findings of fact and conclusions of law. Bankr.R. 7052.

### I.

The debtor is a limited partnership that owns and operates Creekside Landing Apartments in Memphis, Tennessee. The debtor's general partner is Beuerlein, Wunderlich and Company. Beuerlein, Wunderlich and Company is a general partnership whose general partners are Walter Wunderlich, Jr. and James Beuerlein. The apartment complex is managed by Dennison Management Co., Inc. Dennison is owned by James Beuerlein and Walter Wunderlich, Jr.

In 1988, the apartment complex was refinanced with a nonrecourse mortgage in favor of Gibraltar Savings. The Resolution Trust Corporation is conservator for Gibraltar Savings.

The debtor filed Chapter 11 on April 24, 1990. After a hearing, the value of the apartment complex was determined to be $4,320,000. The RTC's claim is $5,150,417.27. The debtor's first plan was denied confirmation in April, 1991.

This amended plan creates four classes of non-priority, unsecured claims:

CLASS 6 contains the RTC's unsecured deficiency of approximately $830,000. The plan proposes to pay 20% on the effective date of the plan in full satisfaction of the Class 6 claim.

CLASS 7A contains 69 trade claims totalling approximately $35,000 and the claims of Dominion Bank and Security Federal Savings and Loan. The Class 7A trade claims are to be paid 75% on the effective date of the plan. Security Federal has a "disputed" $600,000 claim. Beuerlein and Wunderlich are personally liable to Security Federal. Security Federal has agreed to accept $58,000 on the effective date of the plan in full satisfaction of its claim and to release the personal liability of Beuerlein and Wunderlich. Dominion Bank has a claim of approximately $323,000. This claim is partially secured by "pledge notes" or "contribution notes" from the debtor's limited partners and is guaranteed by James Beuerlein and Walter Wunderlich. The plan proposes to allow Dominion to collect the notes held as collateral. Dominion would be left with an unsecured claim of approximately $250,000. Dominion has agreed to accept $100,000 on the effective date of the plan in full satisfaction of this claim.

CLASS 7B contains four insiders with claims totalling approximately $19,420. The plan proposes to pay 20% of the Class 7B claims on the effective date.

CLASS 8 contains the $80,000 claim of James Beuerlein and Associates (a sole proprietorship) and the $333,000 claim of Beuerlein, Wunderlich and Company. The plan proposes to pay 5% of the Class 8 claims on the effective date.

The plan calls for contribution of "new capital" of $250,000. Fifteen new limited partnership interests will be sold for $237,500. Existing limited partners can purchase new interests for $15,833.33 each. Partners who fail to purchase new units will retain no interest in the debtor. If an existing limited partner declines to reinvest, the general partner can designate any entity to purchase the nonsubscribed new units. The general partner can acquire a five percent interest in the reorganized debtor for $12,500. Sixty percent of the "new capital," or $150,000, must be contributed in cash on the effective date of the plan. The remainder may be deferred to the first anniversary of the effective date if the purchaser secures the balance with an irrevocable letter of credit acceptable to the general partner.

The RTC opposes confirmation, arguing that the separate classification of its deficiency claim is improper, that the plan unfairly discriminates against the RTC, and that the plan is not fair and equitable because it fails the absolute priority rule.

## II.

Classification of unsecured claims is measured by a flexible standard in the Sixth Circuit. *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck)*, 800 F.2d 581, 586–87 (6th Cir.1986); *In re Aztec*, 107 B.R. 585, 587 (Bankr.M.D.Tenn.1989). *See also In re Jersey City Medical Ctr.*, 817 F.2d 1055, 1061 (3rd Cir.1987); *Hanson v. First Bank of South Dakota*, 828 F.2d 1310, 1313 (8th Cir.1987); *In re Mortgage Inv. Co. of El Paso*, 111 B.R. 604, 613 (Bankr.W.D.Tex. 1990). *But see Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 948 F.2d 134, 137–41 (5th Cir.1991), *vacated in part on reh'g per curiam* (1992). Although abuse of the voting process through "creative" classification is prohibited, separate classification of unsecured claims with dissimilar attributes or interests is allowed. *U.S. Truck*, 800 F.2d at 586–87. Evidence that the separately classified claim holder has "a different stake in the future viability of the reorganized company," has interests that differ substantially from those of other impaired creditors, or has other means for protecting its claim in the reorganization will support separate classification. *Id.* at 587.

For the reasons stated in *Aztec*, 107 B.R. at 587, the RTC's unsecured deficiency claim can be separately classified. The RTC could not pursue its deficiency against the debtor or its general partner outside of Chapter 11. The unsecured claim of the RTC exists only by operation of § 1111(b) and only in a Chapter 11 case. The RTC has a substantial "other interest" that is not shared by other unsecured claim holders; it has every incentive to vote its large unsecured deficiency claim to affect the treatment of its *secured* claim by defeating confirmation of any plan. *Id.* at 587.

## III.

That the debtor may separately classify the unsecured deficiency claim of the RTC does not resolve whether the plan unfairly discriminates against the RTC's claim. *Az-*

*tec,* 107 B.R. at 587. Section 1129(b)(1) prohibits unfair discrimination against an impaired dissenting class of claims. Discrimination against the RTC is not automatically "fair" simply because its claim exists only by operation of § 1111(b). *Aztec,* 107 B.R. at 592.

In *Aztec,* this court approved a four factor test for fairness of discrimination at cram down in Chapter 11 cases:

(1) Whether the discrimination is supported by a reasonable basis;

(2) Whether the debtor can confirm and consummate a plan without the discrimination;

(3) Whether the discrimination is proposed in good faith; and

(4) The treatment of the classes discriminated against.

*Id.* at 590. *See In re Mortgage Inv. Co. of El Paso,* 111 B.R. 604, 614–15 (Bankr. W.D.Tex.1990); *In re 11, 111, Inc.,* 117 B.R. 471, 478 (Bankr.D.Minn.1990); *In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 63 (Bankr.S.D.N.Y.1990).

The debtor failed to demonstrate that it cannot confirm and consummate a plan without the proposed discrimination and the (unspoken) basis for this discrimination is *not* reasonable. The 75% payment to trade creditors and the $100,000 "settlement" with Dominion Bank unfairly discriminate against the RTC. There is no evidence that a 75% payment to the 69 trade creditors is necessary to protect relationships the debtor needs to reorganize. *Aztec,* 107 B.R. at 590; *Mortgage Inv. Co. of El Paso,* 111 B.R. at 615. There is no evidence that it would be "administratively inconvenient" to pay the trade creditors the same percentage to be paid to the RTC. *Cf. In re South Aiken, Ltd.,* 121 B.R. 7, 9 (Bankr.W.D.Pa.1990). The debtor offered no explanation why Dominion Bank will receive 40% of its $250,000 unsecured claim while the RTC is paid only 20% of its unsecured claim. Dominion Bank "settled" its $250,000 unsecured claim for an immediate payment of $100,000; however, consent by the debtor and a creditor to discrimination in favor of the creditor, especially where the principles of the debtor are personally

liable to the creditor, reveals very little about the debtor's prospects to confirm and consummate a plan without the discrimination. After liquidation of the partners' notes, Dominion has an ordinary unsecured claim. "Level" payment of the RTC, the trade claims and Dominion's unsecured claim would pay approximately 26% of these claims.

The "unspoken" basis for discrimination in favor of the trade creditors and Dominion Bank is that Beuerlein and Wunderlich are personally liable to trade creditors and to Dominion Bank. Beuerlein and Wunderlich are not personally liable to the RTC. That the debtor's owners have personal liability to some unsecured creditors and not to others cannot alone satisfy the test for fairness of discrimination under § 1129(b)(1). *In re 222 Liberty Assocs.,* 108 B.R. 971, 991–93 (Bankr.E.D.Pa.1990). *But cf. Travelers Ins. Co. v. Bryson Properties XVIII (In re Bryson Properties XVIII),* 129 B.R. 440, 445 (M.D.N.C.1991), *rev'd,* No. 91–2614 [961 F.2d 496], 1992 WL 77524 (4th Cir. Apr. 20, 1992). The proposed discrimination primarily benefits the owners of the debtor with no corresponding benefit for general creditors. *Aztec,* 107 B.R. at 590.

### IV.

Whether a Chapter 11 plan is "fair and equitable" is a mixed question of fact and law which must be determined on a case-by-case basis. *Great Western Bank v. Sierra Woods Group,* 953 F.2d 1174 (9th Cir.1992). Section 1129(b)(2) states the minimum requirements of a fair and equitable plan. *Federal Sav. & Loan Ins. Corp. v. D & F Constr., Inc. (In re D & F Constr., Inc.),* 865 F.2d 673, 675 (5th Cir. 1989); *In re Apple Tree Partners, L.P.,* 131 B.R. 380, 395 (Bankr.W.D.Tenn.1991); *In re Outlook/Century,* 127 B.R. 650, 656 (Bankr.N.D.Cal.1991); *In re Triple R Holdings, L.P.,* 134 B.R. 382, 389 (Bankr. N.D.Cal.1991); *In re Pullman Constr. Ind., Inc.,* 107 B.R. 909, 939 (Bankr.N.D.Ill. 1989).

One element of the statutory "fair and equitable" test is the "absolute priority rule" in 11 U.S.C. § 1129(b)(2)(B)(ii): A plan cannot be confirmed over the objection of a class of impaired unsecured claim holders that does not receive payment in full if a junior class of claims or interests receives or retains any property under the plan "on account of such junior claim or interest."

Citing *In re U.S. Truck Co.,* 800 F.2d 581 (6th Cir.1986), the debtor argues that the amended plan satisfies the "new value exception" to the absolute priority rule. The "new value exception" permits existing interest holders to own and control a reorganized business without paying impaired senior classes in full. Although the interest holders may not retain ownership "on account of" pre-bankruptcy ownership rights, existing owners may exchange "new value" to acquire ownership and control of the reorganized debtor. The new value "exception" is thus really an "exclusion" from application of the absolute priority rule.

This circuit has aggressively embraced the "new value exception" to the absolute priority rule. In *U.S. Truck,* for a modest new investment of $100,000, the pre-bankruptcy owners of a trucking company "reacquired" ownership of a business reporting monthly profits in excess of $100,000. 800 F.2d at 588. This favorable inclination to the "new value exception" is evidenced in Sixth Circuit cases prior to *U.S. Truck. See In re Van Sweringen Corp.,* 155 F.2d 1009 (6th Cir.), *cert. denied sub nom. Cleveland Hotel Protective Comm. v. Nat'l Bank of Cleveland,* 329 U.S. 766, 675 [67] S.Ct. 122, 91 L.Ed. 659 (1946); *Metropolitan Holding Co. v. Weadock,* 113 F.2d 207 (6th Cir.1940); *Whitmore Plaza Corp. v. Smith,* 113 F.2d 210 (6th Cir.1940); *In re Wilton Realty Corp.,* 106 F.2d 1022 (6th Cir.1939), *cert. denied,* 308 U.S. 626, 60 S.Ct. 386, 84 L.Ed. 523 (1940), *aff'g per curiam* 30 F.Supp. 486 (E.D.Mich.1938).

To satisfy the "new value exception," the contribution of new value must be substantial and essential. *U.S. Truck,* 800 F.2d at 588. The debtor probably has to prove that it cannot reorganize without new capital.

Some courts have said that reorganization must be impossible without the new contribution. *In re Jartran Inc.*, 44 B.R. 331, 379 (Bankr.N.D.Ill.1984). *See also In re Potter Material Serv., Inc.*, 781 F.2d 99, 102 (7th Cir.1986). It has been held that the new money must be unavailable from any other source or that the old equity holders must be the most feasible source. *See In re Jartran*, 44 B.R. at 379. *See also Potter Material Serv.*, 781 F.2d at 102.

To be substantial, new value must be a present contribution rather than a promise to pay in the future; it must be freely tradeable in the market by the debtor; and it must be an asset in the accounting sense. The contributor must be bearing a *new* economic risk—it is not enough that the contributor of "new" capital is simply continuing an existing risk, satisfying an existing risk, or only changing the form of an existing risk. Forgiveness of debt by itself is not sufficient. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 205–206, 108 S.Ct. 963 [968], 99 L.Ed.2d 169 (1988) (experience, expertise, and promise of future labor not new value); *Metropolitan Holding Co. v. Weadock*, 113 F.2d 207, 209 (6th Cir.1940) ("the reasonable equivalent in money or money's worth"); *In re Van Sweringen Corp.*, 155 F.2d 1009, 1012–13 (6th Cir.), *cert. denied sub nom. Cleveland Hotel Protective Comm. v. Nat'l Bank of Cleveland*, 329 U.S. 766, 67 S.Ct. 122, 91 L.Ed. 659 (1946) ("a contribution in money or money's worth...."); *Whitmore Plaza Corp. v. Smith*, 113 F.2d 210, 211 (6th Cir.1940); *Kham and Nate's Shoes No. 2, Inc. v. First Bank*, 908 F.2d 1351, 1362 (7th Cir.1990) (equity holders' guarantees of the debtor's debts are "intangible, inalienable, and unenforceable" and not substantial new value); *In re Yasparro*, 100 B.R. 91, 98 (Bankr.M.D.Fla.1989) (promissory notes not new value); *In re Future Energy Corp.*, 83 B.R. 470, 499 (Bankr.S.D.Ohio 1988) (promise to pay in future not new value); *In re Snyder*, 99 B.R. 885, 889–90 (Bankr.C.D.Ill.1989) (forgiveness of debt affects only liability side of balance sheet and fails as new value). The Seventh Circuit has held that promises "inadequate to support the issuance of shares under state law are also inadequate to support the issuance of shares by a bankruptcy judge over the protest of the creditors, the real owners of the firm." *Kham & Nate's Shoes*, 908 F.2d at 1362.

New value must be "reasonably equivalent" to what the contributor receives in exchange. *In re Van Sweringen Corp.*, 155 F.2d 1009, 1012 (6th Cir.), *cert. denied sub nom. Cleveland Hotel Protective Comm. v. Nat'l Bank of Cleveland*, 329 U.S. 766, 67 S.Ct. 122, 91 L.Ed. 659 (1946) ("reasonably equivalent in view of all of the circumstances"); *Metropolitan Holding Co. v. Weadock*, 113 F.2d 207, 209 (6th Cir.1940) ("the reasonable equivalent in money or money's worth of the participation accorded"); *Whitmore Plaza Corp. v. Smith*, 113 F.2d 210, 211 (6th Cir.1940); *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121, 60 S.Ct. 1 [10], 84 L.Ed. 110 (1939); *In re Pullman Constr. Ind., Inc.*, 107 B.R. 909, 949 (Bankr.N.D.Ill. 1989); *In re Future Energy Corp.*, 83 B.R. 470, 499 (Bankr.S.D.Ohio 1988). Ownership has value independent of the market value of the debtor's assets. *Ahlers*, 485 U.S. at 207–208 [108 S.Ct. at 969] (rejecting argument that ownership of entity with no net worth and minimal going concern is worthless); *Pullman Constr.*, 107 B.R. at 949. Control and the right of management must be valued as consideration received by those who contribute new capital. Capitalization of future earnings is the starting point for calculation of the value received by the contributor. *Muskegon Motor Stockholders Protective Comm. v. Davis (In re Muskegon Motor Specialties)*, 366 F.2d 522 (6th Cir.1966) ("earning capacity, the capitalization of future profits, is the appropriate method of valuation"); *In re Frank Fehr Brewing Co.*, 268 F.2d 170 (6th Cir.1959), *cert. denied sub nom. Kremer v. Clarke*, 362 [363] U.S. 817, 80 S.Ct. 1250, 4 L.Ed.2d 1157 (1960); *Future Energy*, 83 B.R. at 500. The likelihood of return on the new investment and probable future risks must be considered. *Ahlers*, 485 U.S. at 207–208, [108 S.Ct. at 969]; *U.S. Truck*, 800 F.2d at 588. The likeli-

hood of future increases in the value of assets also is relevant.

Benefits that are personal to an investor are a factor bearing on the value received by that investor. Dividends, distributions or even a future salary from the debtor appropriately are considered. That an interest holder will protect tax benefits or receive new tax benefits enhances the value of the investment to the interest holder. *Pullman Constr.*, 107 B.R. at 949. *But see In re Jartran*, 44 B.R. 331, 380–81 (Bankr.N.D.Ill.1984). Plan payments to creditors that release the investor from liability such as guaranties confer a benefit on the investor that must be valued. *Pullman Constr.*, 107 B.R. at 949–50.

The amount of debt discharged under the plan has been considered an element of the fairness of the exchange. *In re Snyder*, 105 B.R. 898, 901–902 (Bankr.C.D.Ill.1989); *Travelers Ins. Co. v. Olson (In re Olson)*, 80 B.R. 935, 937 (Bankr.C.D.Ill.1987); *Pullman Constr.* 107 B.R. at 950 (rejecting a new value payment of $450,000 when the amount of debt discharged exceeded $12,428,000). Other courts question this factor. *See, e.g., In re Yasparro*, 100 B.R. at 98, 99.

The presence of new investors also has been considered. *See In re Outlook/Century, Ltd.*, 127 B.R. 650, 654 (Bankr. N.D.Cal.1991) (rejecting purchase of interests in reorganized debtor by pre-petition equity holders because no one but the pre-petition equity holders was given an opportunity to purchase). Evidence of the value of an interest in the debtor in the marketplace might be considered. *See In re U.S. Truck Co.*, 47 B.R. 932, 942–43 (E.D.Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir.1986).

This debtor's proposed "new value" is neither substantial nor reasonably equivalent to what re-investing interest holders will receive. Under the amended plan, existing interest holders may acquire ownership of the reorganized debtor by paying $150,000 in money or money's worth at confirmation. The $100,000 balance of "new capital" is deferred for one year in the form of notes from the investors. That the deferred portion must be secured enhances somewhat its "money's worth" characteristics; however, even a note with security is not a current payment of money. The $100,000 must at least be discounted to reflect the time value of money. That the investors are not contributing the full $250,000 at confirmation suggests other advantages are to be realized by deferring 40% of the new investment for one year. During that year, management might forgive the additional investment, discount that investment, or otherwise reduce the economic value of those promises to pay. The $250,000 proposed "new value" is worth substantially less than $250,000 to creditors of the debtor.

By the debtor's projections, the net operating income of the debtor will be approximately $460,000 a year after confirmation. There is no evidence that the property is depreciating in value, that rents will decrease in the future or that there is any substantial risk of loss of these projected net operating incomes. Control of these net operating incomes has substantial economic value to the interest holders and to existing management.

All of the "new value" to be contributed by existing interest holders will be used to retire the claims of insiders or will benefit, directly or indirectly, insiders of the debtor. The $4,000 proposed payment to Class 7B will be paid to four insiders, including the management company owned by Beuerlein and Wunderlich. The $21,000 to be paid to Class 8 claim holders will be paid directly to Beuerlein and Associates and to Beuerlein and Wunderlich. The $58,000 settlement with Security Federal will release the guaranty of Beuerlein and Wunderlich. The $100,000 settlement with Dominion will satisfy a claim that is guaranteed by Beuerlein and Wunderlich. The $26,000 payment to the trade creditors will relieve Beuerlein and Wunderlich of their personal liability as general partners of the debtor. Existing interest holders will contribute $150,000 on the effective date of the plan and the reorganized debtor will immediately disburse $209,000 directly to insiders or to the holders of claims that are guaranteed by Beuerlein and Wunderlich. The

plan does *not* use the "new capital" to pay the unsecured claim of the RTC. Rather, the plan proposes to use net rents accumulated by the debtor during the administrative period to pay 20% of the unsecured deficiency claim of the RTC.

Beuerlein and Wunderlich will receive more cash from the debtor on the effective date of the plan than they must pay to remain owners. Under the amended plan, Beuerlein and Wunderlich re-acquire the general partner's interest in the debtor for $12,500 and immediately receive a distribution of approximately $17,000.

For purposes of the absolute priority rule, it could be said that the value of what existing interest holders will receive on account of their new investments is "greater" than the new money invested because of payments to insiders and to claim holders with guaranties by insiders; or it could be said that it is inappropriate to include as "new value" a contribution by an existing interest holder that will be used to satisfy an obligation of that interest holder or simply to change the form of an existing risk of the interest holder. By either approach, Beuerlein and Wunderlich in particular are revealed to be making no substantial new economic commitment to the reorganization of this debtor—they are reacquiring their ownership rights in exchange for a small contribution of cash that will be immediately returned to them or used to retire obligations that they are already personally obligated to pay. The proposed plan is not fair and equitable to the RTC.

An appropriate order will be entered.

DATED this 29 day of April, 1992.

(s)Keith M. Lundin
Keith M. Lundin
U.S. Bankruptcy Judge

### JUDGMENT ENTRY

Judgment in the above captioned proceeding relating to Greyhound Financial Corporation's objection to the confirmation of Montgomery Court Apartments of Ingham County, Ltd.'s first amended plan of reorganization is sustained in part and overruled in part and the confirmation of the first amended plan proposed by Montgomery Court Apartments of Ingham County, Ltd. is denied, pursuant to an opinion and order dated May 22, 1992.

IT IS SO ORDERED.